## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

| | |
|---|---|
| **AFFILIATED FM INSURANCE COMPANY,** | |
| **PLAINTIFF** | |
| **v.** | **CASE NO. 5:21-cv-00233-DCR** |
| **RAM CONSTRUCTION SERVICES OF MICHIGAN, INC.** | ***ELECTRONICALLY FILED*** |
| **AND** | |
| **WALKER PARKING CONSULTANTS/ ENGINEERS, INC. d/b/a WALKER CONSULTANTS, *et al.,*** | |
| **DEFENDANTS** | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
DEFENDANT, WALKER PARKING
CONSULTANTS/ENGINEERS, INC. d/b/a WALKER CONSULTANTS**

Defendant, Walker Parking Consultants/Engineers, Inc. d/b/a Walker Consultants ("Walker"), by counsel and pursuant to FRCP 56, states as follows for its Memorandum In Support of its Motion for Summary Judgment:

### INTRODUCTION

Plaintiff has asserted claims against Walker for negligence in Walker's performance of its contractual duties on the Project and for negligent misrepresentation in its execution of the Completion Letter (First Amended Complaint, Doc #56, Counts I and II).  The Plaintiff was clearly on notice that it had been damaged on four separate occasions which started the running of the one year statute of limitations in KRS §413.245 and, consequently, Plaintiff's claims against Walker are time barred.  Alternatively, Plaintiff cannot maintain a claim for negligence against Walker because Walker owed no duty to Plaintiff as all of the allegations against Walker are related to its

performance of its contractual duties owed to Friedman.  Lastly, Plaintiff cannot maintain a claim for negligent misrepresentation against Walker because the allegations against Walker do not meet the legal requirements of negligent misrepresentation.  Either of these arguments independently entitles Walker to Summary Judgment.

There are no genuine issues of material fact related to these arguments and Walker is entitled to Summary Judgment as a matter of law.  Accordingly, Walker respectfully moves the Court to enter Summary Judgment in its favor and dismiss the Plaintiffs' Amended Complaint against Walker with Prejudice.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute regarding a material fact exists if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." Olinger v. Corp. of the President of the Church, 521 F. Supp. 2d 577, 582 (E.D.Ky. 2007)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  The moving party has the initial burden of demonstrating the basis of its motion and identifying the parts of the record that establish the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548 ; Chao v. Hall Holding Co., Inc., 285 F.3d 415, 424 (6th Cir. 2002). Once the movant has met its burden, the nonmoving party must come forward with specific facts from the record to show that there is a genuine issue of material fact that is in dispute. Chao, 285 F.3d at 424.

The Court then determines "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 447 U.S. at 242, 100 S.Ct. 2124.  In making this decision, the Court construes the

facts and draws all reasonable inferences in favor of the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Walters v. Gill Indus., Inc., 586 F.Supp.3d 633, 640 (E.D. Ky. 2022).

## FACTS

The Parties involved in this matter are as follows: **Walker** is a consulting firm that provides engineering services for various building structures including parking structures and contracted with **Friedman** to perform certain services on the Parking Garage. WBCMT contracted with RAM Construction Services of Michigan, Inc. ("**RAM**") to perform the remedial repairs to the Parking Garage in 2018.  (Plaintiff's First Amended Complaint, Doc #56, Paragraphs 8-15, 21).

WBCMT 2006-C29 West Vine Street, LLC ("**WBCMT**") was the owner of the Property and the Parking Garage. LNR Partners, LLC ("**LNR**") was the Attorney In Fact for U.S. Bank and WBCMT[1].  Friedman Management Company ("**Friedman**") is a property management company that was appointed by U.S. Bank, through LNR, as Receiver of the Property and Parking Garage.

On March 4, 2019, Lexington Opportunity Fund, LLC ("**LOF**") purchased the Parking Garage from WBCMT.  Plaintiff, Affiliated FM Insurance Company ("**Plaintiff**") insured the Parking Garage for LOF.  LOF never had any employees and it retained the Webb Companies (the "**Webb Companies**") to manage the Property and Parking Garage for LOF.  (Webb Dep. Tr., Ex. A, p. 19).  **LOF** hired Yeiser Structural, LLC ("**Yeiser Structural**") to perform two site visits to the Parking Garage for LOF to assess its conditions and recommend repairs. (Joint Third Party Complaint of RAM and Walker against LOF, Webb Companies and Yeiser Structural, LLC, Doc # 55, Par. 26-29).

This litigation concerns the partial collapse of the top floor of a parking deck (the "Parking Garage") located at the Truist Bank Building (formerly BB&T Bank), 200 West Vine Street in

---

[1] The Court granted LNR's Motion to Dismiss on February 10, 2023. (Memorandum Opinion and Order, Doc. #95).

Lexington, KY (the "Property").  On February 18, 2021 an inverted T beam failed causing a portion

of the upper deck of the Parking Garage to collapse.  (Plaintiff's First Amended Complaint, Doc.

#56, Par. 36; Pawlak Dep. Tr., Ex. B, p. 64; Webb Dep. Tr., Ex. A, p. 61).

**The Project Phase**

On January 25, 2018, Walker contracted with Friedman to prepare plans and specifications

for the repairs to be performed upon the Parking Garage (the "Walker Contract")(First Amended

Complaint, Par. 19, Ex. 5; Pawlak Dep. Tr., Ex. B, p. 112-113, Dep. Ex. 6).  Pursuant to the Walker

Contract, Walker prepared the plans and specifications for the repairs. Once the plans and

specifications were completed, WBCMT c/o LNR contracted with RAM to perform the repair work

to the Parking Garage.  (First Amended Complaint, Par. 19, Ex. 6).

The "Construction Administration" scope of the Walker Contract very specifically provides

that Walker would provide up to four site observation visits and a final visit to make a final punch

list.  (Pawlak Dep. Tr., Ex. B, p. 116, Dep. Ex. 6, Attachment, p. 2).  This number of observation

visits in the Walker Contract was established at Friedman's request. (Pawlak Dep. Tr., Ex. B, pp.

165-166, 181).  Lastly, the Walker Contract also provides that Walker would "[C]omplete any

necessary closeout documentation including letters of substantial completion."  (Pawlak Dep. Ex. 6,

Attachment at p. 3).

Plaintiff took the deposition of Peter Brady, RAM's Project Manager, on September 7, 2022.

(Brady Dep. Tr., Ex. C, p. 22).  Mr. Brady testified that not all of the work on the plans was

completed by RAM because the Project money and time wore thin and RAM was on a directive

basis for what work it was to perform.  (Brady Dep. Tr., Ex. C, p. 67).  According to Mr. Brady, this

was caused by the work expanding and growing due to the time that elapsed between Walker's

original Condition Assessment of the Parking Garage and RAM's work being performed.  (*Id.* at

118).

The Project was completed by RAM in November 2018. Consistent with its duties under the Walker Contract, on November 29, 2018, Walker performed a final walk through of the Project with a representative of LFUCG Building Inspection in order to close out the permit. On January 30, 2019, Walker submitted to LFUCG its letter of "Substantial Completion of Project"[2] (the "Completion Letter"). (First Amended Complaint, Doc. #56, Par. 26, Exhibit 7; Pawlak Dep. Tr., Ex. B, p. 219, Dep. Ex. 30). LOF claims that it relied upon the Completion Letter in its purchase of the Property (Plaintiff's First Amended Complaint, Doc #56, Par. 32-34) and also relied upon assurances from LNR that RAM's work on the Project had been completed. (*Id.* at p. 34; Webb Dep. Tr., Ex. A p. 245, l. 2-17).

The Walker Completion Letter states, in relevant part:

> As part of our scope of work in the construction administration phase of the project, Walker made periodic visits to observe the progress and quality of the restoration work. Based on our limited observations, it is our opinion that the structural restoration work has been performed in substantial conformance with the permit documents and approved shop drawings as of Walker's last visit on November 29, 2018. Walker acknowledges that the alternate waterproofing work included on the permit drawings including tee-to-tee joint sealant and traffic topping replacement was not accepted by the Owner and was not completed as part of this project. (Pawlak Dep. Ex. B, p. 222, Dep. Ex. 30).

In regard to the Completion Letter, Mr. Pawlak testified that the purpose of it was for the city's files and that it was written as part of the permit close out process. (Pawlak Dep. Tr., Ex. A, p. 219, 220). He further testified that he had no idea that, other than LFCUG, others would rely on the Completion Letter or understand the information contained in it. (*Id.* at 224). Mr. Pawlak repeatedly testified that everything in the Completion Letter is correct and there is nothing false contained in the document. (*Id.* at 224, 229).

---

[2] The Walker Letter was not submitted immediately after Walker's November 29, 2018 visit because there were electrical portions of the Project that remained uncompleted until January 2019. These electrical portions of the Project were unrelated to the work performed by Walker and Ram and not part of the permit issued for RAM's work. (Pawlak Dep. Tr., Ex. B, p. 219)

**LOF Pre-Purchase Phase**

At all times relevant to this dispute, Dudley Webb was acting on behalf of LOF as its authorized representative.  (First Amended Complaint, Doc. #56, Par. 13).  On August 31, 2022, Mr. Webb testified as the CR 30(b)(6) designated corporate representative of LOF although his deposition has not been completed to date.  (Webb Dep. Tr., Ex. A, p. 13, l. 11-18).  Mr. Webb testified that he practiced law for approximately three years until 1972 when he got into the real estate business and started the Webb Companies.  Since its inception, Mr. Webb testified that the Webb Companies acquired, developed and managed properties in Lexington and all over the United States with approximately half of those projects being outside of Central Kentucky.  He estimated that in his tenure at the Webb Companies, the entity has been involved in approximately 200-300 commercial real estate projects with approximately 1/3 of those projects being smaller commercial office buildings similar to this Property.  Of these projects he also testified that he has been involved somewhere between 20 and 50 projects that involved purchases of properties that were "distressed" or in receivership like this Property.  (*Id.* at p. 7-9, 11).

Mr. Webb went on to testify that approximately 25% of the properties in his experience involved new construction or rehabilitation and that he is "…familiar with design and construction concepts" by virtue of his experience.  Mr. Webb further testified that he was generally familiar with AIA construction documents and how they work on construction projects and that he understood unit based contracts and that RAM's contract on the Project was a unit based contract. He also testified that he has had a number of parking structures renovated and a number of "patch and repair" projects to parking structures such as this Parking Garage.  (*Id.* at p. 12-13, 99, 182-183, 215-216).

Regarding LOF, Mr. Webb testified that LOF has never had any employees, that the Property and Parking Garage were managed and serviced by the Webb Companies and that he was

acting on behalf of LOF in his review of the information related to the Property. And that the Webb Companies was "…very actively involved in oversight. Very stringently involved [in the Property]." (*Id.* at p. 19, 20, 34, 39).

On January 30, 2019, LOF was the successful on-line bidder on the Property that included the Parking Garage. (Webb Dep. Tr., Ex. A, p. 44). The closing on the Property took place just over one month later on March 4, 2019 (*Id.* at p. 26-28) and Lexington attorney, Tom Marks, represented LOF in its purchase of the Property and Parking Garage. (*Id.* at pp. 33, 34, 71, 101).

At the time of the closing, LOF did not have a copy of the Project's Specifications or the permit drawings or the shop drawings for the Project. The first time anyone from LOF received a copy of the Project's Specifications was, on August 30, 2022, the day before Mr. Webb's deposition when Plaintiff's counsel showed them to him. (*Id.* at p. 64, 100, 191, 194-196, 218). In spite of this, Mr. Webb believed that the Project's Specifications would enable LOF to "…understand that the remedial work was done to bring [the Parking Garage] back to its original condition and that it was done in accordance with code…We were looking for anything and everything that might relate to the condition of the Property when we buy it." (*Id.* at pp. 176, l. 20-23; p. 177, l. 6-8).

A portion of RAM's final Pay Application was provided to LOF by LNR but Mr. Webb testified that he could not determine what work was performed or not performed by RAM on the Parking Garage based upon the document. (*Id.* at p. 76-80, Dep. Ex. 38). Just prior to the closing of the Property, LOF received certain documents related to RAM's work on the garage including a copy of RAM's contract with WBCMT, (*Id.* at pp. 84-92). The closing date, March 4, 2019 was a Monday. (*Id.* at p. 101). Mr. Webb testified that just prior to the closing LOF was attempting to obtain the Project documents because "…the deficiencies [in the Parking Garage] could still exist to the extent they were." (*Id.* at p. 103).

On March 1, 2019, LOF's counsel sent a letter to LNR and others the Friday before the Monday scheduled closing which stated:

Several issues have arose that we need to resolve ASAP.  They are as follows:

We had an engineer examine the work done by RAM Construction Services of Michigan, Inc. for the garage renovations.  The engineer advised us today that about 75% of the work called for in that contract was not completed. We have been told that RAM Construction walked off the job without completing the work for reasons we do not fully understand. That contract had attached to it Exhibit A which was the Contractor's Proposal, but did not have attached to it Exhibit B which was the specifications. We need to see those specifications and get to the bottom of this. We had been proceeding as though all of the work had been completed…we feel it appropriate that we escrow 75% of that contract amount until RAM completes their work.  (*Id.* at p. 104-106, Dep Ex., 41).

On Sunday afternoon, the day before the March 4, 2019 closing on the Property, Dudley Webb emailed LOF's legal counsel, Tom Marks, copied his LOF partner and, in referring to the documents provided by Friedman and LNR, stated:

…I would think that each and all of these documents that we asked for and they finally sent us are admissions by the managing agent of the Seller that the Construction Costs were of greater amounts than they thought and represented in the AIA Report and that their hope was that by selling the project to us, they could somehow avoid paying them.
Plain and simple, their approach to this smelled and the true costs should be a credit on our purchase price. (*Id.* at p. 197-198, Dep. Ex. 44).

On March 4, 2019 the morning of the closing, at 9:29 a.m., LNR emailed LOF's counsel stating:

RAM did not walk off the project – it has been completed in accordance with the specifications. We hired Walker Consulting, an independent firm that specializes in parking decks, to do the initial assessment, prepare and analyze the bid documents and monitor the project and work as the deck repairs were underway. Attached is the letter from Walker to the City confirming that work had been completed as well as the Certificate of Completion for the structural work from the City. (*Id.* at p. 270-271, Dep. Ex. 50).

Also on the morning of the closing at 9:56 a.m., in response to LNR's email that morning and the statements about Walker, LOF's counsel emailed LNR, Friedman and others again stating:

My client's engineer has advised that it does not appear the RAM Contract was completed. The engineer and my client need to see Exhibit B to the RAM Contract which sets out the specifications in order to properly understand and analyze this situation. We don't understand the reluctance in providing this. (*Id.* at p. 280-281, Dep. Ex. 50).

After the closing took place on March 4, 2019, LOF's counsel emailed LNR, Friedman and others with a letter again stating:

> We are disappointed that you have not responded to my letters to you of last Thursday and Friday. It is essential that we have the complete contract with RAM Construction Services of Michigan, Inc. From the information we have it appears RAM has been paid in full but only performed about 25% of the work. We need an explanation as this is a contract that will assigned to us and we may have claims against RAM for improper performance or failure to perform their contract. We may also have claims against Donovan as they have not completed their work.  We need all the information on that contract as well. (*Id.* at p. 292-293, Dep. Ex. 51).

In regard to Mr. Marks' statements about potential damages that LOF may have had, Mr. Webb testified:

> Q. Do you believe, on the date of the closing, that LOF had been damaged?
>
> A. I don't think we knew at that point in time. We were still trying to get our arms around it. What we did know, that there's a claim out there of $625,000 and potential work that had not been done. (*Id.* at p. 300, l. 13-19)…
>
> Q. And you think you may have been damaged at this point, but you don't know?
>
> A. Well, we may have because there's $625,000 of work that we were assured had been done that wasn't done.  Because it's carved out and they put us on notice -- or not us, you all on notice, that it was still outstanding.  That work was not done.  Remember the two e-mails ago, that number, 600 and some thousand dollars popped up for the first time.  (*Id.* at p. 301, l. 19-25, p. 302, l. 1-3).

In regard to the documents LOF had received prior to the closing on the Property and understanding what work had actually been performed by RAM, Mr. Webb admitted that LOF did not have the required information to understand what had been repaired on the Parking Garage. (*Id.* at p. 109-110, 126-127, 199).  And he further admitted that it would be hard to understand what RAM did without going to the Parking Garage and having someone explain to him what exactly was performed and where it was performed.  (*Id.* at p. 217-218).  Yet, Mr. Webb continually testified that LOF ultimately relied upon the email from LNR that he referred to as the comfort letter wherein LNR stated that the Project was complete and RAM was paid in full.  (*Id.* at p. 245).

9

In regard to the Completion Letter submitted to LFCUG by Walker, Mr. Webb testified that he did not have an understanding of how many periodic visits were made by Walker or what these observation visits entailed.  He further testified that he had no knowledge of whether Walker had a contractual duty to "inspect" RAM's work on the Parking Garage  (*Id.* at pp. 211, 212-213, 217) and agreed that he could not determine what work was performed by RAM from reading Walker's Completion Letter.  (*Id.* at pp. 222-223, 225, 242).  And he went on to state that LOF "…got to the point where we felt fairly comfortable based upon the representations by the seller that the work had been done, [RAM] had been paid, and we closed. But we don't know."  (*Id.* at p. 242, l. 19-23).

The only alleged misrepresentation or false statement in the Completion Letter that Mr. Webb could identify was that a portion of the deck collapsed when he repeatedly stated "All I can tell you is the [Parking Garage] collapsed…The parking garage collapsed…That was my point, the proof is in the pudding that the garage collapsed, and we don't know –we're trying to find out why. (*Id.* at pp. 228, l. 8-12, 235-236, 238, 240, 247).

Mr. Webb clarified further that in proceeding with the closing, LOF relied upon the "comfort letter" from LNR when he stated:

> Q. …I'm asking you what you needed to go forward, what your opinion was that you needed to go forward with the closing.
>
> A. I needed to know that the previous contracts had been adhered to, that the work had been inspected, that the work had been done properly, that the contractor had been paid, and we would close. And there were questions about all of those. Still out there. Still lingering. And the comfort letter came from the seller that all these things were accomplished. We relied upon that.
>
> Q. You're referring to the e-mail from Ms. Chommie [from LNR]?
>
> A. Yes, we are.  (*Id.* at p. 245, l. 2-17).

**Post Property Closing Phase**

Not long after the closing of the Property, falling concrete on the lower level of the Parking Garage necessitated LOF rope off a portion of that level and close access to it.  Other than roping off part of the lower level, LOF did not do any repairs to the Parking Garage after the closing up until the time of the partial collapse. (*Id.* at p. 141-148).  The roped off section included approximately one half of the lower level of the Parking Garage and also included the location of the beam that failed causing the partial collapse.  (*Id.* at p. 146, Dep. Ex. 42; Pawlak Dep. Tr., Ex. B, p. 64, Dep. Ex 2).  However, no other corrective or cautionary measures were taken by LOF to repair the Parking Garage prior to its partial collapse.  (Webb Dep. Tr., Ex. A, p. 148).  In regard to the falling concrete observed within a few weeks of closing, Mr. Webb stated:

> And this largely resulted in my conversations with RAM as to what they're going to do about it. Because again, the representation was that this had all been cured and here we are with a recurring problem. (Webb Dep. Tr., Ex. A, p. 147, l. 18-22).

On the very next day after the closing, Mr. Webb, reached out to Peter Brady of RAM to obtain "Additional information on what [work] might not have been done" on the Parking Garage. (*Id.* at p. 308, l. 11-12, Dep. Exhibits 53, 54; Brady Dep. Tr., Ex. C, p. 220-223, 262).  On March 8, 2019, Mr. Brady emailed a letter to Mr. Webb with a breakdown of the quantities of work that RAM proposed in its bid versus what RAM actually completed on the Project in 2018.  In this letter, Mr. Brady clarifies to Mr. Webb:

> Per our conversation earlier this week, we have provided the following specifications regarding the work that was proposed for the deck. As you can see, the original scope was far from what was necessary for the deck and inevitably changed over the course of the project. The deck still passed city inspection, however due to the budgetary and timing constraints of the previous owner the deck did not receive all of the work recommended by RAM Construction. See below is an itemized list detailing what the original proposed scope was and what it inevitably evolved into. (Brady Dep. Tr., Ex. C, p. 264, 278-279, Dep. Ex. 80, p. 3-4).

The conversations continued between Mr. Webb and Mr. Brady through March 2019 and a letter dated April 1, 2019 from RAM included proposed pricing on repairs to the Parking Garage which totaled $452,190.00[3].  In this letter, Mr. Brady states:

> As per your request, RAM Construction Services has reviewed the above mentioned deck at the BBT Building in downtown Lexington. Through our investigation we found a plethora of issues/damage that raised concerns of longevity and safety regarding the deck. The following is an itemized list of potential hazards and improvements along with the associated per unit pricing for each scope for you to choose from, if desired we propose to furnish all labor, material, equipment, supervision and insurance necessary to complete the following…(Brady Dep. Tr., Ex. C, p. 229, Dep. Exhibits 82, 83).

The communications during this period also included Mr. Webb's March 26, 2019 request for an estimate to completely replace the Parking Garage and RAM's response on April 10, 2019 of $44,785.00 per parking space.[4]  (Brady Dep. Tr., Ex. C, p. 227, 235, Dep. Ex. 81, 84).

Approximately six months later, in the fall of 2019, LOF hired Yeiser Structural to inspect the Parking Garage and review existing conditions to provide recommendations for further repairs. On October 29, 2019, Jordan Yeiser sent a letter to the Webb Companies with his assessment and list of needed repairs identifying several areas of significant disrepair and noting "worn, cracked and spalled" concrete and visible rust.  (Ex. E; Joint Third Party Complaint of RAM and Walker against LOF, Yeiser, and the Webb Companies, Doc #55, Par. 26, Ex. 5).

In the summer of 2020, over concerns with cracking in a column that was connected to a beam supporting an inverted tee girder in the ceiling on the bottom level of the Parking Garage, Webb, on behalf of LOF, again directed Yeiser to perform another inspection of the Parking Garage.  On August 28, 2020, Jordan Yeiser sent an email to Webb which stated, in part:

> There is quite  bit of work that needs to be done to this area.  The column is the secondary issue.  The beam to the right is in significant disrepair and deterioration.

---

[3] The RAM estimate does not include the total but identifies quantities and unit prices that total $452,190.00.
[4] The parking structure was estimated to have 241 parking spaces in the closing documents made available to LOF making the total replacement costs of the Parking Structure based on this estimate $10,793,185.00 (241 spaces x $44,785.00)

The following shall be performed in the immediate future:
• A temporary support shall be placed under the beam approximately 3' away from the column.
• The loose material shall be removed from the column.
• Attempt to locate the original construction drawings…

(Exhibit D, Joint Third Party Complaint of RAM and Walker against LOF, Yeiser, and the Webb Companies, Doc #55, Par. 28-29, Ex. 6).

LOF and Webb did not follow Yeiser's recommendation to place temporary support under the beam or any other recommendation from Yeiser. (Webb Dep. Tr., Ex. A, p. 141-148). An investigation into the failed beam that caused the partial collapse of the Parking Garage revealed that it was the very beam referenced by Yeiser in his email to Webb less than six months before the collapse. (Exhibit D; Pawlak Dep. Tr., Ex. B, p. 64, Dep. Ex 2; Joint Third Party Complaint of RAM and Walker against LOF, Yeiser; and the Webb Companies, Doc #55, Par. 30-32, 35, Ex. 6).

Plaintiff's insurance coverage for the Parking Garage was in effect at the time of the partial collapse on February 18, 2021. Plaintiff alleges that it has been damaged in excess of $11,000,000.00. (First Amended Complaint, Doc #56, Par. 14, 46). Plaintiff contends that it has made payments to LOF to reimburse it for the damages resulting from the collapse of the Parking Garage pursuant to the Policy and that it is subrogated to the rights of LOF to the extent of its payments to LOF. (*Id.* at Par. 47). Plaintiff has asserted claims against Walker for negligence in Walker's performance of its duties on the Project and for negligent misrepresentation in its submission of the Completion Letter (First Amended Complaint, Doc #56, Counts I and II).

## ARGUMENT

## I. THE PLAINTIFF IS BOUND BY THE ACTIONS AND OMISSIONS OF ITS INSURED, LOF

Plaintiff's claims against Walker are for Plaintiff's subrogated rights of LOF to the extent of its payments to LOF. (First Amended Complaint, Doc #56, Paragraph 47). Under Kentucky law,

like most jurisdictions, "…as subrogee, the insurance carrier stands in the shoes of its insured by operation of law; its cause of action is not greater than his, and his has been merged into a judgment which was satisfied by payment." Sharp v. Bannon, 258 S.W.2d 713, 715 (Ky. 1953); United States v. Munsey Trust Co., 332 U.S. 234, 242 (1947); Wine v. Globe American Cas. Co., 917 S.W.2d 558, 561 (Ky. 1996). Consequently, the insurers are also subject to all legal and equitable defenses that the third party tortfeasor may have had against the policyholder. *Id.* Furthermore, in a subrogation case, "the insurance carrier is bound by the limitations period applicable to the claim of the insured against the third party." Board of Educ. of Estill County, Ky v. Zurich Ins., 180 F.Supp.2d 890, 892 (E.D. Ky. 2002), *citing*, Comm. Depart. of Transp., Bureau of Highways v. All Points Const. Co., 566 S.W.2d 171 (Ky.App. 1977). Here, Plaintiff has stepped into the shoes of its insured, LOF, and so it follows that Walker cannot be liable to Plaintiff if it is not liable to LOF.

## II.   THE PLAINTIFFS' AMENDED COMPLAINT AGAINST WALKER IS BARRED BY THE ONE YEAR STATUTE OF LIMITATIONS IN KRS §413.245

KRS §413.245 provides the limitations period for professional service malpractice actions in both tort and contract and has continuously been applied to professional engineering services such as those provided by Walker on the Project. Board of Educ. of Estill County, Ky v. Zurich Ins., 180 F.Supp.2d 890 (E.D. Ky. 2002); Matherly Land Surveying v. Gardiner Park, 230 S.W.3d 586 (Ky. 2007); Vandevelde v. Falls City Builders, Inc., 744 S.W.2d 432, 433 (Ky. App.1988). This statute provides:

> … a civil action, *whether brought in tort or contract*, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year *from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured*…KRS 413.245 (*emphasis added*).

KRS § 413.245 contains two different measurements of the statute of limitations period: the occurrence rule and the discovery rule. Rumpke of Ky. v. Terracon Consultants, Inc. (E.D. Ky. 2022, pp. 11-12), *citing*, Queensway Fin. Holding Ltd. v. Cotton & Allen, P.S.C., 237 S.W.3d 141, 148

(Ky. 2007); <u>Lore, LLC v. Moonbow Investments, LLC</u>, No. 2012-CA-001305-MR, 2014 WL

507382, at 8 (Ky. Ct. App. Feb. 7, 2014).  The discovery limitation period

> …begins to run when the cause of action was discovered or, in the exercise of reasonable diligence, should have been discovered…Kentucky law has never required a specified dollar amount be known before the statute of limitations can run and the statute of limitations begins to run as soon as the injury becomes known to the injured even if the extent of the damages is unknown. <u>Rumpke of Ky. v. Terracon Consultants, Inc.</u> (E.D. Ky. 2022, p.12), *citing,* <u>Queensway</u>, 237 S.W.3d at 148; <u>Matherly Land Surveying, Inc. v. Gardiner Park Dev., LLC</u>, 230 S.W.3d at 591; <u>Board of Educ. of Estill County</u>, 180 F.Supp.2d 890, 893 (E.D. Ky. 2002).

Even taking the facts in a light most favorable to the Plaintiff, there are multiple instances

from two sources, RAM and Yeiser Structural, that LOF was expressly advised it had been damaged

in that RAM did not complete all of the repairs, that significant costs were necessary to repair the

garage and that LOF did not receive the Parking Garage in a condition which it believes it bargained

for in the purchase of the Parking Garage.  The Court does not even need to consider Mr. Webb's

admission that on the date of the closing, LOF had been damaged, or the multiple communications

immediately after the closing from LOF's counsel mentioning LOF's engineer's assessment or that

LOF believed it may have claims against RAM and Donovan.

RAM's communications to LOF directly conflict with LOF's claimed understanding of what

work had been completed on the Parking Garage, LOF's claimed understanding and interpretation

of Walker's Completion Letter and LOF's claimed understanding of the Parking Garage's condition

at the time of closing.  In each of these separate notice instances, LOF was made aware of the facts

for which it now alleges support its allegations against Walker for Walker's alleged failure to exercise

ordinary and reasonable care in assessing, designing repairs, approving RAM's work or submitting

the Completion Letter.  *Clearly, all of the facts on which Plaintiff relies for its claims against Walker were known*

*by LOF immediately after the closing and none of this changed before or after the partial collapse of the Parking*

*Garage.*  However, LOF continued to do nothing in response to these notices and its knowledge but

sat by and let the Parking Garage continue to deteriorate and ultimately partially collapse.

**(A) The Limitations Period For Plaintiff's Causes of Action Against Walker Began to Run On March 8, 2019 Barring Any Claims Against Walker On March 8, 2020**

The March 8, 2019 letter from RAM to LOF states, in relevant part:

Per our conversation earlier this week, we have provided the following specifications regarding the work that was proposed for the deck. **As you can see, the original scope was far from what was necessary for the deck and inevitably changed over the course of the project. The deck still passed city inspection, <u>however due to the budgetary and timing constraints of the previous owner the deck did not receive all of the work recommended by RAM Construction</u>. See below is an itemized list detailing what the original proposed scope was and what it inevitably evolved into.** (Brady Dep. Tr., Ex. C, p. 264, 278-279, Dep. Ex. 80, p. 3-4)(*emphasis added*).

LOF was clearly advised in March 2019 that it had sustained damages because of LNR's decision to decrease the scope of repairs.  This letter confirms that LOF's pre-closing suspicions were correct and, due to the LNR directives, RAM did not complete all of the necessary repairs to the Parking Garage.  LOF became aware at this point that it did not received the Parking Garage in a condition that it believed it had bargained for with the seller's agents.  Additionally, LOF learned of all the facts it now relies upon for its allegations against Walker.  This knowledge that LOF had been damaged began the running of the limitations period for its causes of action against Walker.

Even outside the contents of the letter, LOF's knew it had damages because, within a few weeks of the closing, LOF noticed falling concrete and roped off a portion of the Parking Garage.  Regarding this, Mr. Webb testified that  "Again, the representation was that this had all been cured and here we are with a recurring problem." (Webb Dep. Tr., Ex. A, p. 147, l. 18-22). LOF's knowledge of having *damage* is the key. The knowledge of which party may be responsible is not necessary for the running of the statute of limitations.

Kentucky law is clear that the limitations period begins to run when:

…the cause of action was discovered **or, in the exercise of reasonable diligence, should have been discovered**…Kentucky law has never required a specified dollar amount be known before the statute of limitations can run and the **statute of limitations begins to run as soon as the injury becomes known to the injured even if the extent of the damages is unknown**." <u>Rumpke of Ky. v. Terracon Consultants, Inc.</u> (E.D. Ky. 2022, p.12), *citing,*

Queensway, 237 S.W.3d at 148; Matherly Land Surveying, Inc. v. Gardiner Park Dev., LLC, 230 S.W.3d at 591; Board of Educ. of Estill County, 180 F.Supp.2d 890, 893 (E.D. Ky. 2002)(*emphasis added*).

Additionally, the statute of limitations in KRS § 413.245 begins to run when the plaintiff **first discovers** the problems for which it asserts its claims.  Old Mason's Home of KY, Inc. v. Mitchell, 892 S.W. 2d 304 (Ky.App. 1995).  In this matter, the court dismissed claims against an architect because the problems were obvious and continuous from 1983 through at least 1987 and the limitations period was "…undoubtedly triggered at the time when [the plaintiff] discovered the problems about which it seeks redress pursuant to the complaint…"  Id. at 307 (*emphasis added*); *see also*, Matherly Land Surveying, Inc. v. Gardiner Park Development, LLC, 230 S.W. 3d 586, 591 (Ky. 2007)(holding "The statute of limitations begins to run as soon as the injury becomes known to the injured.")(*citations omitted*).

Additionally, Affholder, Inc. v. Preston Carroll Co., Inc., 27 F.3d 232 (6th Cir. 1994) addressed the general question of when the statute of limitations begins to run.  On this point, the court stated:

> **A party is responsible to know the date on which a cause of action is or reasonably should have been discovered.  It is that knowledge, whether actual or imputed, that triggers the start of any applicable statute of limitations**. Gill v. Warren, 751 S.W.2d 33 (Ky.App. 1988).  **Knowledge that one has been wronged starts the running of the statute of limitations**. Conway v. Huff, 644 S.W.2d 333 (Ky. 1982).  Affholder, at 235 (*emphasis added*).

This Court's opinion in Board of Educ. of Estill County, Kentucky v. Zurich Insurance Co., et al., 180 F.Supp. 2d 890 (E.D.Ky. 2002) dismissed claims against an engineer as untimely and held that the damages alleged by the plaintiff do not have to be fixed and non-speculative in order for the statute of limitations to begin to run stating:

> The [plaintiff] **may not have known the full extent of the damage or even who was responsible, but…these facts are of no consequence**.  The important and ultimately dispositive point is that the [plaintiff] did know of damage on April 5, 1999.  It was not a "mere probability" that the [plaintiff] would suffer damage; rather, the damage had already been done. Id. at 893.

17

*See also*, Saalwaechter v. Thomas A. Carroll and Thomas A. Carroll, PSC, 525 S.W.3d 100 (Ky.App. 2017)(confirming that damages need not be fixed and non-speculative in order for the limitations period in KRS 413.245 to begin).

Regardless of the amount of Plaintiff's damages or whether it was due to the actions of RAM, Walker, LNR or Friedman is of no consequence as LOF knew it was damaged at least by March 8, 2019.  At this point there was falling concrete in the Parking Garage and LOF learned that RAM did not complete all of the necessary repairs to the Parking Garage.  LOF clearly became aware that it had not received the Parking Garage in a condition that it believed it had bargained for and the limitations period for its claims against Walker began to run.  In order for the limitations period in KRS § 413.245 to run, LOF did not need to know who was responsible, it simply needed to know that it had been damaged and it was clearly aware of this fact.

LOF received RAM's letter on March 8, 2019 dictating that Plaintiff's claims against Walker would be time barred March 8, 2020.  Plaintiff's Complaint was filed over a year and a half later on September 15, 2021.  (Plaintiff's Complaint, Doc. #1).  Accordingly, Plaintiff's claims against Walker were not timely file and must be dismissed under KRS § 413.245 and the clear precedent cited above.

**(B) The Limitations Period For Plaintiff's Causes of Action Against Walker Began to Run A Second Time On April 1, 2019 Barring Any Claims Against Walker On April 1, 2020**

Within three weeks of the closing, on April 1, 2019, LOF was advised of RAM's estimate for further repairs totaling $452,190.00 and was again advised of the significant safety concerns, damage and repairs needed for the Parking Garage:

> As **per your request**, RAM Construction Services has reviewed the above mentioned deck at the BBT Building in downtown Lexington. **Through our investigation we found a plethora of issues/damage that raised concerns of longevity and safety regarding the deck.** The **following is an itemized list of potential hazards and improvements along with the**

**associated per unit pricing for each scope for you to choose from**... (Brady Dep. Tr., Ex. C, p. 229, Dep. Exhibits 82, 83)(*emphasis added*).

Again, during this period LOF was aware of falling concrete and LOF was provided with an estimate of $452,190.00 to complete the repairs and address the safety concerns.  LOF again became aware that it had not received the Parking Garage in a condition that it had believed it had bargained for and LOF learned of a second time of all the facts it now relies upon for its allegations against Walker.  And this is when the limitations period for its claims against Walker began to run a second time.  LOF did not even need to exercise the statutorily required reasonable diligence to discover that it had been damaged as it is explicitly told by RAM that LOF's damages, at least at this point, were estimated to be $452,190.00.

LOF received the second RAM letter on April 1, 2019 dictating that Plaintiff's claims against Walker would be time barred April 1, 2020.  Plaintiff's Complaint was filed over a year and a half later on September 15, 2021.  (Plaintiff's Complaint, Doc. #1).  Accordingly, Plaintiff's claims against Walker were not timely filed and must be dismissed under KRS § 413.245 and the clear precedent cited above.

**(C)** **The Limitations Period For Plaintiff's Claims Against Walker Began to Run A Third Time On October 29, 2019, Barring Any Claims Against Walker On October 29, 2020**

Approximately six months after RAM's April 1, 2019 letter and estimate, in response to requests from LOF, Yeiser Structural inspected the Parking Garage to review existing conditions to provide recommendations for further repairs.  On October 29, 2019, Jordan Yeiser, a licensed professional engineer, sent a letter to the Webb Companies with his assessment and list of needed repairs identifying several areas of "significant" disrepair and noting "worn, cracked and spalled" concrete and visible rust.  (Ex. E; Joint Third Party Complaint of RAM and Walker against LOF, Yeiser, and the Webb Companies, Doc #55, Par. 26, Ex. 5).

19

LOF had a third clear notice that the Parking Garage it had purchased was not in the condition it believed it had bargained for, and the limitations period for its claims against Walker began to run.  LOF could have been exercising its reasonable diligence in tasking Yeiser to inspect the Parking Garage.  LOF was again put on notice of the significant disrepair of the garage and the detailed areas of repair were identified by Yeiser as being necessary.

LOF received Yeiser's report on October 29, 2019 meaning that Plaintiff's claims against Walker would be time barred October 29, 2020.  Plaintiff's Complaint was filed on September 15, 2021.  (Plaintiff's Complaint, Doc. #1).  Accordingly, Plaintiff's claims against Walker were not timely filed and must be dismissed under KRS § 413.245 and the clear precedent cited above.

**(D) The Limitations Period For Plaintiff's Causes of Action Against Walker Began to Run A Fourth Time On August 28, 2020 Barring Any Claims Against Walker On August 28, 2021**

In the summer of 2020, over concerns with cracking in a column that was connected to the very beam that failed, LOF directed Yeiser to perform another inspection of the Parking Garage. On August 28, 2020, Jordan Yeiser sent an email to Webb which stated, in part:

> There is quite  bit of work that needs to be done to this area.  The column is the secondary issue.  **The beam to the right is in significant disrepair and deterioration.**
>
> **The following shall be performed in the immediate future**:
> • **A temporary support shall be placed under the beam** approximately 3' away from the column.
> • The loose material shall be removed from the column.
> • Attempt to locate the original construction drawings…

(Ex. D; Pawlak Dep. Tr., Ex. B, p. 64, Dep. Ex 2; Joint Third Party Complaint of RAM and Walker against LOF, Yeiser; and the Webb Companies, Doc #55, Par. 30-32, 35, Ex. 6)(*emphasis added*).

The Court is encouraged to review the photos in Exhibit D as they are no less than shocking and do not require a construction or licensed professional to conclude that the beam's failure was imminent.  At this point, LOF was well aware that it had significant damages as the

conditions in the Parking Garage were "obvious and continuous" from the closing date of March 4, 2019 through the August 28, 2020 date of Yeiser's email. <u>Old Mason's Home of KY, Inc. v. Mitchell</u>, 892 S.W. 2d 304 (Ky.App. 1995). LOF again became aware that it had not received the Parking Garage in a condition that it believed it had bargained for and the limitations period for its claims against Walker began to run. And again, LOF did not even need to investigate to exercise the statutorily required reasonable diligence to discover that it had been damaged as it was explicitly told by Yeiser specifically pointing out to LOF that the beam that would eventually fail. Despite this, LOF took no action in response to being put on notice of its damages for a fourth time.

At the very latest the limitations period could begin to run was August 28, 2020 when LOF received Yeiser's email and photos expressing his concerns over the very beam that failed. The August 28, 2020 date of Yeiser's email dictates that Plaintiff's claims against Walker would be time barred on August 28, 2021. Plaintiff's Complaint was filed on September 15, 2021. (Plaintiff's Complaint, Doc. #1). Accordingly, Plaintiff's claims against Walker were not timely filed and must be dismissed under KRS §413.245 and the clear precedent cited above.

## III.   ALTERNATIVELY, PLAINTIFF'S GENERAL NEGLIGENCE CAUSE OF ACTION AGAINST WALKER IN COUNT I MUST BE DISMISSED BECAUSE PLAINTIFF CANNOT ESTABLISH AS A MATTER OF LAW THAT WALKER OWED PLAINTIFF ANY INDEPENDENT DUTY OF ANY KIND

Count I of Plaintiff's First Amended Complaint contains the general negligence claims against Walker but does not specify the source of any duty owed to LOF or Plaintiff. (First Amended Complaint, Doc # 56 at Paragraph 50.) The only duties Walker owed to any party on the Project were to Friedman under the Walker Contract. The Plaintiff's claims are really a claim that Walker was negligent in its performance of its contractual duties owed to Friedman and all of the negligence allegations asserted by the Plaintiff are for breaches of duties within the scope of the Walker Contract with Friedman. There clearly is no independent duty outside of these contractual

duties being asserted by the Plaintiff and the Plaintiff has not alleged and cannot establish any such duty.

Presnell Construction Managers, Inc. v. EH Construction, LLC, 134 S.W.3d 575 (Ky. 2004) is the seminal precedent in Kentucky addressing the assertion of negligence claims against a party for breach of its contractual duties by a party that is not in contractual privity. Barton Brands v. O'Brien & Gere, Inc., 550 F.Supp.2d 681 (W.D. Ky. 2008). In Presnell, the facts involved negligence claims by a contractor against the construction manager. Both the contractor and the construction manager contracted separately with the owner and there was no contractual privity between the contractor and construction manager. The contractor alleged that the construction manager failed to properly "stage and time" the work at the construction site and, as a result, the contractor was required to redo much of the work that it had already completed. Presnell, at 578.

The Kentucky Supreme Court affirmed the lower court's dismissal of the negligent supervision claim and stated that a party "…may not maintain an action for negligence which consists merely in the breach of contract." Id. at 579. Furthermore, the court made it clear that it was dismissing the claims it determined were part of the construction manager's contractual duties stating that the tort claim "…does not articulate a claim that [was] independent of [the construction manager's] contractual duties." Id. at 582-583.

As the Court explained in Presnell:

"Privity of contract" is "[t]he relationship between parties to a contract, allowing them to sue each other but preventing a third party from doing so." Thus, "[o]rdinarily, the obligations arising out of a contract are due only to those with whom it is made; a contract cannot be enforced by a person who is not a party to it or in privity with it, except under a real party in interest statute or, under certain circumstances, by a third-party beneficiary." Consequently, "[a]s a general rule, whenever a wrong is founded upon a breach of contract, the plaintiff suing in respect thereof must be a party or privy to the contract, and none but a party to a contract has the right to recover damages for its breach against any of the parties thereto."… Presnell, at 579 (citations omitted)…

unless [the construction manager] breached some duty to [the contractor] apart from its duties to [the project owner] under the contract — i.e. an independent duty — [the

contractor], who was, at the most, an incidental beneficiary of the contract between [the project owner] and [the construction manager], cannot maintain an action in negligence against [the construction manager]. *Id.,* at 579-80.

Kentucky's State and Federal courts have consistently dismissed claims for negligent performance of contractual duties that are asserted by a party that does not have contractual privity with the defendant. Barton Brands v. O'Brien & Gere, Inc., 550 F.Supp.2d 681, 684-685 (W.D. Ky. 2008); Superior Steel, Inc. v. Ascent at Roeblings Bridge, LLC, 540 S.W.3d 770 (Ky. 2017).

There was admittedly no contract between Walker and Plaintiff. (First Amended Complaint, Par. 19, Ex. 5; Pawlak Dep., pp. 112-113, Dep. Ex. 6). The only duties owed and actions undertaken by Walker were to Friedman, and undertaken as part of the Walker Contract.

It is obvious that because Walker did not breach any duties owed under its contract with Friedman, the Plaintiff is attempting to recover under some other extra-contractual or independent duty of Walker outside the Walker Contract so that the Plaintiff can attempt to state a claim against Walker. Simply put, the Plaintiff is clearly attempting to choose a remedy that does not exist because no duty exists. The authority of Presnell and the subsequent precedent prohibit a party that is not in contractual privity from asserting a claim for the alleged negligent performance of a contractual duty.

Even taking the facts in a light most favorable to the Plaintiff, Walker's duties were exclusively owed to Friedman, not to the Plaintiff. Reviewing the claims alleged in the Amended Complaint clearly reveals that the Plaintiff is stating a breach of contract claim but attempting to disguise it as negligence and that there is no alleged breach of any duty outside of Walker's contractual duties owned to Friedman. Accordingly, under the authority of cited above, summary judgment in favor of Walker is appropriate as a matter of law regarding the Plaintiff's negligence claims against Walker in Count I of the First Amended Complaint.

## IV.   ALTENATIVELY, PLAINTIFF'S CAUSE OF ACTION FOR NEGLIGENT MISRESPRESNETATION IN COUNT II MUST BE DISMISSED BECAUSE WALKER'S CERRTIFICATION LETTER DOES NOT MEET THE REQUIREMENTS OF NEGLIGENT MISREPRESENTATION

Count II of Plaintiff's First Amended Complaint contains the negligent misrepresentation

claims against Walker and states:

The Completion Letter falsely represented that the restoration work performed by RAM upon the Parking Garage was in substantial conformance with the permit documents and approved shop drawings.  (First Amended Complaint, Doc # 56 at Paragraph 55).

In Presnell Construction Managers, Inc. v. EH Construction, LLC, 134 S.W.3d 575, 580 (Ky.

2004)(*emphasis added*), the Kentucky Supreme Court adopted the RESTATEMENT (SECOND) OF

TORTS §552 (1977) which illustrates the elements for negligent misrepresentation:

(1)  One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, **supplies false information for the guidance of others** in their business transactions, is subject to liability for pecuniary loss caused **to them by their justifiable reliance** (See Anne Taylor case on not justifiable in reliance) upon the information, **if he fails to exercise reasonable care** of competence in obtaining or communicating the information.
(2)  Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
   (a)  by the person or one of a limited group of persons **for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it**; and
   (b)  **through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction**…

Multiple State and Federal Courts in Kentucky have interpreted the elements of negligent

misrepresentation:

…a plaintiff asserting negligent misrepresentation must prove that: 1) the transaction at issue is one in which the defendant had a pecuniary interest; 2) the defendant supplied false information; 3) the information was supplied for others' guidance in their business transactions; 4) the defendant failed to exercise reasonable care in communicating the information; 5) the plaintiff acted in reliance thereon; and 6) the false information caused injury. Helton v. Am. Gen. Life Ins. Co., 946 F. Supp. 2d 695, 707 (W.D. Ky. 2013), *citing* Presnell, 134 S.W.3d at 580–82.

The same Court later refined the application of certain elements of negligent

misrepresentation requiring the plaintiff to demonstrate: (1) the plaintiff was a reasonably

foreseeable recipient of the information; (2) he justifiably relied on the information; (3) he exercised reasonable care in relying on the information… Sims v. Atrium Med. Corp., 349 F.Supp.3d 628, 644 (W.D. Ky. 2018), *citing*, Estate of DeMoss v. Eli Lilly and Co., 234 F.Supp.3d 873, 880 (W.D. Ky. 2017)(*citing*, Presnell Constr. Managers, Inc. v. EH Constr., LLC, 134 S.W.3d 575, 580 (Ky. 2004)).

Applying the required elements of negligent misrepresentation to this matter, Plaintiff must be able to prove all of the following:

(A)  That Walker's representation was false,
(B)  That Walker failed to exercise reasonable care in communicating the information,
(C)  That LOF justifiably relied upon the misrepresentation and exercised reasonable care in its reliance,
(D)  That the representation was made to LOF for the guidance of the LOF,
(E)  That LOF acted upon the misrepresentation, and
(F)  That the misrepresentation caused injury to LOF and the Plaintiff

A review of the facts most favorable to the Plaintiff clearly dictates that it cannot meet a single element necessary to assert a claim for negligent misrepresentation against Walker.

**(A) Walker Did Not Supply False Information to the Plaintiff**

There is simply no misrepresentation or false statement contained in the Completion Letter. The letter contains multiple qualifiers and limiting language and offers only the opinion of Walker based upon these limitations.  The letter does not say RAM completed the entire scope of work. Rather, it is Walker's opinion that, based upon these multiple limitations, RAM's work was in substantial conformance with the permit documents.  The Completion Letter provides, with the obvious qualifiers in bold print, as follows:

> **As part of our scope of work** in the construction administration phase of the project, **Walker made periodic visits to observe the progress and quality of the restoration work**. **Based on our limited observations, it is our opinion that the structural restoration work has been performed in substantial conformance with the permit documents and approved shop drawings as of Walker's last visit on November 29, 2018**. **Walker acknowledges that the alternate waterproofing work included on the permit drawings including tee-to-tee joint sealant and traffic topping replacement was not accepted by the Owner and was not completed as part of this project.** (Pawlak Dep. Ex. B, p. 222, Dep. Ex. 30).

The limitations in the letter are clear and include:

1. Walker made only periodic visits based on the scope of work in the Walker Contract;
2. The purpose of the visits was to observe the progress and quality of the work [not to "inspect" as the Plaintiff continues to argue];
3. The opinion is based upon limited observations;
4. That the letter contains Walker's opinion based on these limitations and not an affirmation of fact as to quantity or quality of work completed;
5. That RAM's work was performed in **substantial** conformance with the permit documents;
6. As of Walker's last visit on November 29, 2018; and
7. The alternate water proofing work was not accepted by Friedman and not completed

Equally important, Mr. Pawlak repeatedly testified that everything in the Completion Letter is correct and there is nothing false contained in the document.  (Pawlak Dep. Tr., Ex. B, pp. 224, 229).  Even Mr. Webb admitted that the only alleged misrepresentation or false statement in the Completion Letter that LOF could identify was that a portion of the deck collapsed when he repeatedly stated "All I can tell you is the [Parking Garage] collapsed…The parking garage collapsed."  (Webb Dep. Tr., Ex. A, p. 228, l. 8-12, 235-236, 238, 240).  He further clarified this when he stated:

> Q. And you can't sit here today and tell me anything that's false or misrepresentative in this letter, other than because roughly 20 months later after this letter was written, a portion of the parking deck collapsed?
>
> A.   That's correct.  That was my point, the proof is in the pudding that the garage collapsed, and we don't know -- we're trying to find out why.  (Webb Dep. Tr., Ex. A, p. 247, l. 15-24).

Obviously there is nothing contained in the Completion Letter discussing potential collapse of the Parking Garage.  "…[n]egligent misrepresentation requires an affirmative false statement… The Supreme Court has emphasized that "…this tort requires an affirmative false statement; a mere omission will not do." Giddings & Lewis Inc. v. Indus. Risk Insurers, 348 S.W.3d 729, 746 (Ky. 2011)(*citing*, Republic Bank & Trust Co. v. Bear, Stearns & Co., 707 F.Supp.2d 702, 714 (W.D.Ky. 2010)).  Furthermore, "[T]he tort of 'negligent misrepresentation' requires a misrepresentation – **an**

omission , or a subjective inference he may have drawn from a truthful representation, is not enough." <u>McAlpin v. Am. Gen. Life Ins. Co.</u>, 601 S.W.3d 188, 194 (Ky.App. 2020)(*emphasis added*).

The record is clear that the Walker Completion letter contains no misrepresentation or false statement and is simply Walker's opinion based on multiple limitations.  This is obvious by the specific limiting language in the Completion Letter, Mr. Pawlak's clear testimony and Mr. Webb's admission that the only false statement or misrepresentation in the Completion Letter is that the deck collapsed and LOF is trying to figure out why.  An affirmative false statement of Walker is the single most important element of Plaintiff's claim and it simply does not exist.  This lack of false statement or misrepresentation was further confirmed by LOF through its admissions.  Accordingly, the record is clear that Plaintiff cannot meet the *first* required element to sustain a claim against Walker for negligent misrepresentation.

### (B) The Statements in the Completion Letter Were Not False And Were Made With Reasonable Care

Negligent misrepresentation requires that Walker made a false statement or that it made statements without exercising reasonable care.  The letter simply expresses Walker's opinion based upon multiple limitations.  The Completion Letter was submitted to LFCUG as part of the required permit close out process and Walker's contractual obligations under the Walker Contract with Friedman.  (Pawlak Dep. Tr., Ex. B, p. 219-224).  The language of the letter is extremely qualified and repeatedly states that it is Walker's opinion based upon the limited observations that it was contractually obligated to provide.  Again, there are no false statements and the statements were made by Walker exercising reasonable care based upon their contractually imposed limited observations.  Accordingly, the record is clear that Plaintiff cannot meet the *second* required element to sustain a claim against Walker for negligent misrepresentation.

**(C) LOF's Alleged Reliance Was Not Justifiable And It Failed To Exercise Reasonable Care In Relying on the Completion Letter**

**(1)  LOF's Reliance Was Not Justifiable and It Failed to Exercise Reasonable Care**

"…[r]eliance on the representation must be **reasonable and justifiable**…Moreover, "[a] plaintiff's **knowledge and experience are relevant to a determination of whether his reliance was reasonable**," so "**the law imposes upon recipients of business representations a duty to exercise common sense**."  Epps Chevrolet Co. v. Nissan N. Am., Inc., 99 F.Supp.3d 692, 706-707 (E.D. Ky. 2015), *citing*, Republic Bank & Trust Co. v. Bear, 707 F.Supp.2d 702, 710 (W.D.Ky.2010). *See also*, Options Home Health of N. Fla., Inc. v. Nurses Registry & Home Health Corp., 946 F.Supp.2d 664, 671 (E.D. Ky. 2013).

At the time of the Property closing Dudley Webb had almost 50 years of experience in approximately 200-300 real estate transactions across the United States.  This experience included somewhere between 20 and 50 projects that involved purchases of properties that were "distressed" or in receivership like this Property and approximately 25% of the 200-300 properties involved new construction or rehabilitation which enabled him to be "…familiar with design and construction concepts".  This experience also included renovation of a number of parking structures and a number of "patch and repair" projects such as this Parking Garage.  (Webb Dep. Tr., Ex. A, p. 7-9, 11-13, 215-216).

Immediately prior to the closing, Mr. Webb and LOF were skeptical about what work had been completed on the Parking Garage:

> …**all of these documents…they finally sent us are admissions by the managing agent of the Seller that the Construction Costs were of greater amounts than they thought and represented in…and that their hope was that by selling the project to us, they could somehow avoid paying them.** (Webb Dep. Tr., Ex. A, p. 197-198, Dep. Ex. 44)(*emphasis added*).

On two separate instances after the closing, LOF's counsel repeatedly wrote to LNR that in spite of

receiving LRN's email assuring RAM's work on the garage was complete, LOF's engineer's estimate

indicated that only 25% of it had been completed.  (Webb Dep. Tr., Ex. A, p. 280-281; p. 292-293).

In regard to the documents LOF had received prior to the closing including the Completion

Letter, Mr. Webb repeatedly and unequivocally admitted that LOF did not have the required

information to understand what had been repaired on the Parking Garage and that he did not

understand what type of repairs were done or the repair locations.  (Webb Dep. Tr., Ex. A, p. 126, l.

5-11; p. 199, 217, 242).  And he further admitted that it would be hard to understand what RAM did

on the Project without going to the Project and having someone explain to him exactly what was

performed and where it was performed.  (Webb Dep. Tr., Ex. A, p. 217-218).

Specifically, in regard to Walker's Completion Letter and LOF not understanding it, Mr.

Webb stated:

> Q. **So in order to understand Walker's certification letter that's attached to the Complaint, you would have to have more documentation**?
>
> A. **We would have to have more documentation**, but it was enough to satisfy the city.
>
> Q. **Right.  You would have to understand the scope of work**?
>
> A. **Yeah**.
>
> Q. **And what was actually performed, not what was proposed, but what was performed**?
>
> A. **Right.** And all we had to rely upon was the draw request and the grid that you all supplied, that somebody supplied, the seller supplied.  (Webb Dep. Tr., Ex. A, p. 109, l. 14-25, p. 110, l. 1-7)(*emphasis added*).

Mr. Webb testified that he did not have an understanding of how many periodic visits were

made by Walker or what these observation visits entailed or whether Walker had a contractual duty

to "inspect" RAM's work on the Parking Garage  (Webb Dep. Tr., Ex. A, pp. 211-213, 217) and

agreed that he could not determine what work was performed by RAM from reading Walker's

Completion Letter.  (Webb Dep. Tr., Ex. A, pp. 222-223, 225).  However, LOF "…got to the point where we felt fairly comfortable based upon the representations by the seller that the work had been done, [RAM] had been paid, and we closed. But we don't know."  (Webb Dep. Tr., Ex. A, p. 242, l. 19-23). "And the comfort letter came from the seller that all these things were accomplished. We relied on that."  (Webb Dep. Tr., Ex. A, p. 245, l. 2-17).

If LOF relied upon anything contained in the Walker Completion Letter in order to proceed with the closing, LOF was neither justified nor did it exercise reasonable care in its reliance.  There are countless admissions by LOF that it did not understand the Completion Letter and had no way to understand what work had been completed on the Parking Garage.  Nor did LOF understand the scope of Walker's services on the Project.  After being assured by LNR that RAM's work on the Project was complete, LOF's own counsel twice wrote that only 25% of RAM's work had been completed on the Project.  None of this even accounts for LOF's pre-closing suspicions that were continually expressed prior to receiving the Completion Letter within hours of the closing.

More importantly, Mr. Webb's extensive experience in real estate, "distressed" real estate purchases and garage remediation projects identical to this one confirm that, under all of these circumstances, any LOF reliance on the Completion Letter from Walker would have been neither reasonable nor justified.  LOF's alleged reliance clearly did not exercise the required "common sense" especially with the significant experience of Mr. Webb.  Accordingly, the record is clear that Plaintiff cannot meet the *third* required element to sustain a claim against Walker for negligent misrepresentation.

### (2) The Court Has Already Determined That LOF Could Not Rely on the March 4, 2019 Email from LNR or the Walker Completion Letter

Plaintiff alleges that, in a March 4, 2019 email, LNR represented to LOF that RAM's work on the Parking Garage was completed in accordance with the specifications and both referenced and attached Walker's Completion Letter to its email.  Plaintiff also claims that LOF relied on all of this

information to proceed with its purchase of the Property and Parking Garage. (First Amended
Complaint, Doc. #56, Par. 30-34, Ex. 8). The LNR email is almost solely based upon the contents
of the Completion Letter.

On December 6, 2022, Defendant, LNR, filed a Motion to Dismiss Plaintiff's claims against
it and the Court granted this Motion dismissing LNR on February 10, 2023. (LNR Partner, LLC's
Motion to Dismiss for Failure to State a Claim, Doc. #78; Memorandum Opinion and Order, Doc.
#95). In dismissing the Plaintiff's fraudulent misrepresentation claim against LNR, the Court's
Memorandum and Opinion Order states:

> …for any statements made after signing the Purchase Agreement, **including the statements
> contained in LNR's March 2019 email, the plaintiff cannot demonstrate reliance because
> the terms of the Purchase Agreement expressly provided that LOF was not relying on
> any representations regarding the Parking Garage made by WBCMT or LNR**. [Record
> No. 78-1, pp. 14-15] (Memorandum Opinion and Order, Doc. #95, p. 12-13)(*emphasis added*).

> The Court went on to note that:

> …the contract states that by signing the Purchase Agreement **LOF acknowledges that it had
> "sufficient opportunity" to independently investigate the condition of the Parking
> Garage, and that from that point forward LOF could not rely on the Seller or Seller
> Group's representations regarding the property**. [*Id.* at p. 13]

> **The plaintiff cannot claim that LNR's statements in the March 2019 email, however
> misleading, induced LOF to purchase the Parking Garage when LOF had already
> agreed to purchase the property "as is."** Accordingly, the plaintiff's fraudulent
> misrepresentation claim will be dismissed. (*Id.* at p. 15)(*emphasis added*).

In dismissing the Plaintiff's negligent misrepresentation claim against LNR for failure to plead
justifiable reliance, the Court's Memorandum and Opinion Order states:

> LOF agreed in the Purchase Agreement that **it would not "rely[] upon any representation of
> any kind" made by WBCMT or LNR regarding the Parking Garage at the time of LNR's
> alleged misrepresentations**. [Record No. 78-1] **Because LOF could not rely on any
> representations made by LNR under the express terms of its contract with WBCMT, its
> purported reliance on LNR's representations in the March 2019 email were unreasonable
> as a matter of law**…(*Id.* at 17)(*emphasis added*).

Walker is not claiming to be a party to the Purchase Agreement or a beneficiary of that agreement. However, the Court's findings on this issue prohibited LOF from relying on LNR's email and its attachments. The LNR email is based almost exclusively on the language of the Walker Completion Letter and a copy of the letter was provided to LOF in this email. As the Court noted, LOF could not rely upon LNR's representations in the March 2019 email and any reliance was unreasonable as a matter of law. As LOF could not rely on LNR's March 2019 email which was wholly dependent upon the Completion Letter, LOF is barred from relying on the Completion Letter and any reliance would have been unreasonable and unjustifiable. Accordingly, the record is clear that Plaintiff cannot meet the *third* required element to sustain a claim against Walker for negligent misrepresentation.

### (D)The Completion Letter Was Not Provided For the Guidance of LOF, <u>AND</u> (E) LOF Did Not Act On The Alleged Misrepresentation

Consistent with its duties under the Walker Contract and in order to close out the permit, on January 30, 2019, Walker submitted its Completion Letter to LFUCG. (First Amended Complaint, Doc. #56, Par. 26, Exhibit 7). Mr. Pawlak, the author of the Completion Letter, testified that the purpose of it was for the city's files and that it was written as part of the permit close out process. (Pawlak Dep. Tr., Ex. B, p. 219, 220). He further testified that he had no idea that, other than LFCUG, that others would rely on the Completion Letter or even understand the information contained in it. (*Id.* at 224).

Firstly, the Completion Letter was submitted to LFUCG and intended to close out the permit and it was not provided to LOF by Walker at any point. More importantly, the Completion Letter was not "intended to provide guidance" to LOF but simply to close out the permit and comply with Walker's contractual obligations to Friedman.

Additionally, Plaintiff claims that, in a March 4, 2019 email, LNR represented to LOF that RAM's work on the Parking Garage was completed in accordance with the specifications and both

referenced and attached Walker's Completion Letter to its email.  Plaintiff also claims that LOF

relied on *all* of this information to proceed with its purchase of the Property and Parking Garage.

(First Amended Complaint, Doc. #56, Par. 30-34, Ex. 8).  Accordingly, the record is clear that

Plaintiff cannot meet the *fourth or fifth* required element to sustain a claim against Walker for

negligent misrepresentation.

### (F) The Alleged Misrepresentation of Walker Did Not Cause Injury to the Plaintiff

Plaintiff maintains that  LOF relied upon the alleged misrepresentations in the Completion

Letter in its decision to purchase the Property.   However, Plaintiff also maintains that it was damaged

when the inverted tee beam failed causing a portion of the upper deck to collapse.  While LOF alleges

that it decided to close on the property based upon the Completion Letter, Plaintiff was not damaged

by any alleged misrepresentation contained in the letter.

Plaintiff was damaged by LOF's continual refusal to respond in any way to the repeated

warnings for safety, repairs and shoring from both RAM and Yeiser as well as LOF's own

observations of falling concrete in the Parking Garage.  These notices and warnings began on March

8, 2019 via RAM's first letter to LOF and this was only three days after LOF claims it received the

Completion Letter.  LOF was again warned on April 1, 2019 through RAM's letter and estimate for

repairs, a third time through Yeiser's October 29, 2019 recommended repairs and finally on August

28, 2020 through Yeiser's warnings for immediate shoring and repairs to the failing beam.

There is simply no causal connection between the Completion Letter, LOF's claimed

reliance and Plaintiff's alleged damages for the partial collapse.  Even if there was some connection,

it is clear that LOF's lack of response and refusal to initiate repairs to the Parking Garage permitted

Plaintiff's damages to occur.  Accordingly, the record is clear that Plaintiff cannot meet the *sixth*

required element to sustain a claim against Walker for negligent misrepresentation.

**CONCLUSION**

The record is clear that there are no issues of disputed material fact which would prevent the Court's granting of summary judgment. Plaintiffs' claims against Walker are barred by KRS §413.245 because LOF was aware that it had been damaged on at least four separate occasions which started the running of the limitations period. Alternatively, Plaintiffs' claims are also barred by the clear and binding precedent dictating that Walker cannot be found negligent for breach of a contractual duty owed to Friedman and not to LOF or the Plaintiff. Also alternatively, Plaintiff cannot meet a single element required for negligent misrepresentation in the Walker Completion Letter. Accordingly, Walker respectfully moves the Court to grant Summary Judgment in its favor and dismiss all of Plaintiffs' claims and their Amended Complaint against Walker with prejudice.

       /s/ *Darren J. Duzyk*
       Darren J. Duzyk
       Darren J. Duzyk, PLLC
       P.O. Box 21806
       Lexington, KY 40522-1806
       (859) 559-2450
       dd@constructionlawky.com

       *Counsel for Walker Parking Consultants/Engineers, Inc.*
       *d/b/a Walker Consultants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Jefferson C. Orr
Vic L. McConnell
Smith Cashion & Orr, PLC
One American Center
3100 West End Avenue, Suite 800
Nashville, TN 37203

Charles H. Stopher
Boehl Stopher & Graves
400 W. Market Street
2300 Aegon Center
Louisville, KY 40202

*Counsel for Plaintiff, Affiliated FM Insurance
Company and Third Party Defendants, Lexington
Opportunity Fund, LLC & The Webb Companies*

Michael S. Maloney
Stephen C. Keller
Schiller Barnes Maloney, PLLC
401 West Main Street, Suite 1600
Louisville, KY  40202

*Counsel for Defendant RAM Construction
Services of Michigan, Inc.*

*Counsel for Third Party Defendant,
Yeiser Structural, LLC*

Kyle M. Virgin
J. Austin Anderson
Freeman Mathis & Gary, LLP
2525 Harrodsburg Road, Suite 500
Lexington, KY 40504-3215

*Counsel for Defendant, Friedman
Management Group*


*/s/ Darren J. Duzyk*
Darren J. Duzyk