UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| AFFILIATED FM INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 21-233-DCR |
| V. | ) ) | |
| WALKER PARKING CONSULTANTS/ENGINEERS, INC. AND FRIEDMAN MANAGEMENT COMPANY, | ) ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Affiliated FM Insurance Company ("Affiliated FM") reimbursed Lexington Opportunity Fund, LLC ("LOF") for damages after a two-story Parking Garage (the "Parking Garage") owned by LOF collapsed in February 2021.  Affiliated FM filed this action against Defendants Walker Parking Consultants/Engineers, Inc. ("Walker"), Friedman Management Company ("Friedman"), RAM Construction Services of Michigan, Inc. ("RAM"), and LNR Partners, LLC ("LNR").  It seeks subrogation of the reimbursement payments made to LOF. [Record No. 56]

Walker has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Friedman filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  [Record Nos. 100, 101]  For reasons that follow, the defendants' motions will be granted.

- 1 -

## I. Background

### A. Parking Garage Repairs

The Parking Garage was previously owned by WBCMT 2006-C29 West Vine Street, LLC ("WBCMT"). [Record No. 56, p. 2] Friedman was appointed as Receiver of the Parking Garage pursuant to a Fayette Circuit Court order which directed the defendant to "take charge and possession of, preserve, operate, maintain, and care for the [Parking Garage]." [Record No. 56-2, p. 2] Friedman hired Walker in July 2017 to evaluate the condition of the Parking Garage and identify any necessary repairs. [Record No. 109-4] Walker assessed the Parking Garage and submitted a report ("Walker's assessment report") in which the defendant noted that "moisture infiltration through the control joints has led to extensive concrete deterioration as well as corrosion of the supplemental bearing steel throughout the garage." [Record No. 56-4, p. 5] Walker recommended several repairs, including "shor[ing] as necessary precast tee stems with exposed strands," removing "all unsound concrete . . . and [repairing] any exposed reinforcement." [*Id.* at pp. 5, 9]

Friedman hired Walker again in January 2018 to prepare construction documents for the repairs contained in Walker's assessment report. [Record No. 56-5] The parties' contract specifies that Walker would "[c]onduct up to four (4) observation visits during the repairs at regular intervals to review construction for general conformance with the design intent of the specifications and drawings and verify unit cost quantities." [*Id.* at p. 9] Walker further agreed to "[m]ake a final punch list visit towards project completion" and to "[c]omplete any necessary closeout documentation including letters of substantial completion." [*Id.*]

WBCMT contracted with RAM in March 2018 to perform the repairs identified in Walker's assessment report. [Record No. 56-6] RAM agreed to, among other things, "install

new concrete and reinforcing . . . materials to restore concrete beams and joists to original condition and appearance." [Record No. 109-7]  The parties agreed that RAM would be paid for 290 square feet of beam repairs. [Record No. 56-6, p. 33]

RAM began repairing the Parking Garage in July 2018, and Walker conducted site visits in accordance with its contractual obligations.  After participating in a walkthrough with a representative from the Lexington-Fayette Urban County Government ("LFUCG") in October 2018, Walker issued a report noting that the project had progressed. [Record No. 109-14]  The report indicated that several areas of the Parking Garage required further repairs, specifically noting that RAM should repair the "interior inverted tee beam[s] . . . as noted in the construction documents." [*Id.* at p. 5]   Walker completed its final walk through on November 29, 2018.

LFUCG notified RAM after construction began that the parties were required to secure permits for the project. [Record No. 100-3, p. 200]  Walker employee Kyle Pawlak submitted drawings to LFUCG indicating Walker's proposed repairs in September 2018. [Record No. 109-12]   Pawlak sent a letter to LFUCG in January 2019 certifying that RAM had "substantial[ly] complet[ed]" the repair work as described in Walker's assessment report and drawings. [Record No. 109-19]

Dawn Davis, a LFUCG employee, questioned the accuracy of the initial completion letter.  Davis asked Pawlak why Walker "had marked many of the areas on the upper parking deck to be repaired in your drawings, but decided that now they don't need [to be] repaired." [Record No. 109-18]  Davis further requested that Walker ensure that "the work that was shown on your drawings was completed"  and that he identify "any work that has been removed from the scope of the project." [*Id.*]

On January 30, 2019, Walker sent a revised letter to LFUCG (the "completion letter").

[Record No. 56-7] The completion letter states, in relevant part:

> As part of our scope of work in the construction administration phase of the project, Walker made periodic visits to observe the progress and quality of the restoration work. Based on our limited observations, it is our opinion that the structural restoration work has been performed in substantial conformance with the permit documents and approved shop drawings as of Walker's last visit on November 29, 2018.

[Record No. 56-7]   LFUCG accepted Walker's submission and issued a certificate of completion for the Parking Garage.  [Record No. 100-3, p. 225]

## B.  LOF's Purchase of The Parking Garage

LOF successfully bid on the Parking Garage during an online auction in January 2019. [Record No. 100-2, p. 44]  LOF employed the Webb Companies to oversee the purchase of the Parking Garage and manage the property pursuant to a written agreement (the "Management Agreement").  [Record No. 110-3]  The Management Agreement specifies that Webb would be appointed "as an independent contractor to manage the . . . related parking garage," and that Webb "hereby accepts such appointment and the fiduciary relationship thereby established."  [*Id.* at p. 1]

Dudley Webb, co-founder of the Webb Companies, oversaw the management of the Parking Garage.  [Record No. 100-2, p. 13]  Webb and LOF attorney Tom Marks assisted LOF in signing an agreement (the "Purchase Agreement") to purchase the Parking Garage from WBCMT on January 30, 2019.  [Record Nos. 56, p. 5, 78-1]  The Purchase Agreement provides that the parties would execute their contract on January 30, 2019 and close on the purchase on March 4, 2019.  [Record No. 78-1, pp. 2, 9]  The contract defines the term "Seller" to include "the heirs, personal representatives, successors and assigns of the respective part[y]," and defines the "Seller Group" as including "Seller and its member and such member's trustee,

- 4 -

master servicer, special servicer and certificate holders, all subsidiaries . . . and each of the foregoing parties' past, present, and future . . . agents, employees, representatives . . . assigns and attorneys." [*Id.* at pp. 8, 29]

The Purchase Agreement disclaims warranties on behalf of the Seller, stating that LOF was "not relying upon any representation of any kind or nature made by Seller, or any of its employees or agents or Seller Group with respect to the land or the property." [*Id.* at p. 15] It further provides that LOF agreed to purchase the property "'as is, where is, and with all faults, whether known or unknown." [*Id.* at p. 14] The contract states that, aside from LOF and WBCMT, "no other party shall be entitled to rely upon any provision hereof for any purpose whatsoever." [*Id.* at p. 31] Finally, the Purchase Agreement permits either party to terminate the contract if, "after the Execution Date and prior to Closing," an event occurs that would cost more than 15% of the purchase price to repair or that would "materially interfere with the present use of [the] Property." [*Id.* at p. 29]

## C. Post-Purchase Communications

After the LOF and WBCMT executed their contract, Webb and Marks requested information from Friedman and LNR, LOF's attorney in fact, to verify that the repairs listed in Walker's assessment report had been completed. [Record Nos. 109-21, 109-22] Marks stated in a March 1, 2019 letter to Friedman that, "[b]ased upon the [information] that was provided to us, it appears RAM Construction did all the work and was paid in full. Is that correct?" [Record No. 109-21] Webb stated in his March 1, 2019, email that he needed copies of the "original or contracted scope of work" to determine "what was supposed to be fixed, what actually was fixed or what was changed in the process." [Record No. 109-22]

In response, Friedman employee Cassie Riley sent copies of RAM's original contract with Walker, as well as an approved change order request for $97,493 of additional repairs. [*See* Record No. 109-23, pp. 3, 5-8.]   Riley suggested providing additional documents outlining RAM's expected repairs, but Friedman employee Karin Meier refused, stating that the proposed additional documents "were items that were bid that were not contracted and . . . [providing them] will just confuse the issue."  [Record No. 56-12]

On March 3, 2019, Webb emailed Marks expressing doubt that RAM had completed the repairs contained in Walker's assessment report.  [Record No. 100-15]  Webb opined that "each and all of these documents [sent by Friedman] are admissions by the managing agent of the Seller that the Construction Costs were of greater amounts than they thought . . . and that their hope was that by selling the project to us, they could somehow avoid paying them."  [*Id.*] Webb suggested that as a result of Friedman's misrepresentations, "the true costs [of repairs] should be a credit on our purchase price."  [*Id.*]

LNR sent copies of Walker's completion letter and assessment report to Marks on March 4, 2019.  [Record No. 56-9]  A LNR representative told Marks that "RAM did not walk off the project—it has been completed, in accordance with the specifications, and paid in full." [Record No. 56-9]  In response, Marks emailed LNR a second time stating that "[LOF's] engineer has advised that it does not appear the RAM Contract was completed.  The engineer and [LOF] need to see [the RAM contract] which sets out the specifications in order to properly understand and analyze this situation."  [Record No. 100-16]

LOF proceeded with the purchase of the Parking Garage later that day, "[i]n reliance upon the representations of Friedman, LNR, and information contained in the Walker Contract, the RAM Contract, the Completion Letter, and the Certificate of Completion."  [Record No.

56, ¶ 34]  Dudley Webb explained that despite his doubts as to whether "the previous contracts had been adhered to . . . [and whether] the work had been done properly," he and Marks relied on the completion letter as proof that RAM sufficiently completed the specified repairs contained in Walker's assessment report.  [Record No. 100-2, p. 245]  Webb acknowledged that although the letter did not specifically state which repairs RAM completed or how Walker supervised those repairs, the letter made him "fairly comfortable. . . that the work had been done [and RAM] had been paid."  [*Id.* at p. 242]

Marks again emailed LNR and Friedman after closing and requested "the complete contract with RAM."  [Record No. 100-17]  Marks explained that because "it appears RAM has been paid in full, but only performed about 25% of the work," LOF needed the contract to determine whether to assert "claims against RAM for improper performance or failure to perform their contract."  [*Id.*]  On March 5, 2019, Webb reached out to RAM to determine the "[s]cope of the work that had previously been done."  [Record No. 100-2, p. 308]  RAM employee Peter Brady responded on March 8, 2019, explaining that the "original scope [of repairs] was far from what was necessary for the [Parking Garage]," and that due to "budgetary and timing constraints of [WBCMT]," the property "did not receive all of the work recommended by [RAM]."  [Record No. 100-20, p. 3]  At Webb's request, Brady provided an estimate for proposed repairs to the Parking Garage on April 1, 2019, which included suggestions for additional beam repairs.  [Record No. 100-23, p. 1]

LOF did not conduct additional repairs on the Parking Garage after it purchased the property.  Dudley Webb testified that, shortly after closing, LOF was forced to rope off a portion of the Parking Garage after pieces of concrete began falling from the ceiling.  [Record No. 100-2, pp. 141-42]  The falling concrete further prompted Webb to doubt whether RAM

- 7 -

had completed the repairs in Walker's assessment report.  [*Id.* at p. 147]  Webb asked "what [RAM was] going to do about [the falling concrete] . . . [because] the representation was that this had been all cured and here we are with a recurring problem."  [*Id.*]

In October 2019, the Webb Companies hired Yeiser to inspect the Parking Garage. [Record No. 55-5]  Yeiser employee Jordan Yeiser evaluated the condition of the Parking Garage and recommended certain repairs.  Specifically, Yeiser stated that "[t]he precast concrete 'T' are in overall good condition.  There are a few locations of rust exposure and at least one instance of significant damage to the bottom of the 'T.'" [*Id.*]

Yeiser was hired the following year to conduct a second assessment of the property after employees expressed concern over a column "connected to a beam supporting an inverted tee girder in the ceiling on the bottom level of the Parking Garage."  [Record No. 56, ¶ 28] Jordan Yeiser inspected the column at issue and emailed Webb on August 28, 2020 that "[t]here is quite bit [sic] of work that needs to be done to this area.  The column is the secondary issue.  The beam to the right is in significant disrepair and deterioration."  [Record No. 55-6] He suggested placing a temporary support under the beam at issue and noted that the parties "can develop a repair method in the coming weeks."  [*Id.*]  But the Webb Companies did not follow Yeiser's recommendations.

The Parking Garage partially collapsed on February 18, 2021.  [Record No. 56, ¶ 36] An investigation revealed that the collapse occurred when a "pre-stressed concrete inverted tee girder in the elevated Parking Garage deck . . . failed."  [*Id.* at ¶ 37]  The investigation also revealed that "the work specified by Walker that was to be performed on the collapsed inverted tee girder was never performed by RAM," and that "Walker failed to confirm that [the specified repair work] . . . was completed by RAM."  [*Id.* at ¶¶ 37-40]  A final billing statement

submitted by RAM "indicate[s] that only 20 square feet out of the specified 290 square feet of beam repair was completed by RAM." [*Id.* at ¶ 41, Record No. 56-11] Following the collapse, LOF filed a claim for coverage with Affiliated FM. [Record No. 56, ¶ 12] Affiliated FM reimbursed LOF for damages resulting from the collapse, pursuant to LOF's insurance agreement. [*Id.* at ¶ 15]

Affiliated FM filed this action against RAM, Walker, Friedman, and LNR on September 15, 2021, seeking subrogation for its payments to LOF. The plaintiff's Amended Complaint asserts two claims against Walker and one claim against Friedman. It first asserts a negligence claim against Walker (Count 1), alleging that the defendant breached its duty to use "ordinary and/or reasonable care in assessing the condition of the Parking Garage, designing the repairs to be performed upon the Parking Garage, and in observing, approving and ultimately confirming the completion of the repair work." [*Id.* at ¶¶ 48-52] Affiliated FM next asserts a negligent representation claim (Count 2), contending that Walker "falsely represented that the restoration work performed by RAM . . . was in substantial conformance with the permit documents and approved shop drawings." [*Id.* at ¶¶ 53-60] Finally, the plaintiff asserts a fraudulent concealment claim against Friedman (Count 7), claiming that Friedman "willfully, intentionally, and maliciously failed to disclose" the nature of RAM's repair work. [*Id.* at ¶¶ 86-93]

## II. Walker's Motion for Summary Judgment

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the moving party must show the absence of a genuine issue of material fact concerning an essential element of the opposing party's claim. *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the finder of fact could render a verdict in its favor.  *Celotex Corp.*, 477 U.S. at 324.

### A. Affiliated FM is Bound by the Actions of LOF

As a preliminary matter, the parties do not dispute that Affiliated FM, as LOF's insurance carrier, "stands in the shoes of [LOF]" for purposes of this subrogation action.  [*See* Record Nos. 100-1 (citing *Sharp v. Bannon*, 258 S.W.2d 713, 715 (Ky. 1953)), 109, at p. 17.] Accordingly, the plaintiff is bound by the actions of LOF and is subject to any defenses that the defendants may assert against LOF.

### B. Statute of Limitations

Walker argues that the plaintiff's claims are time barred under the relevant statute of limitations.  [Record No. 100-1, pp. 14-21]  The defendant explains that LOF became aware that RAM failed to repair the Parking Garage in accordance with its contractual obligations over a year before the plaintiff filed this action, making its claims untimely under KRS § 413.245.  Specifically, Walker claims that LOF discovered its cause of action on four occasions: (1) on March 8, 2019, when Brady emailed Webb that the Parking Garage "did not receive all of the work recommended by [RAM]"; (2) on April 1, 2019, when RAM submitted an estimate for further repairs indicating that the company discovered "a plethora of issues/damage" at the Parking Garage that had not been fixed; (3) on October 29, 2019, when

- 10 -

Yeiser submitted its initial assessment noting areas of "significant damage"; and (4) on August 28, 2020, when Yeiser assessed the Parking Garage a second time and notified the Webb Companies that the inverted tee beam that ultimately collapsed was in "significant disrepair." [*Id.*]  The defendant contends that because LOF "continued to do nothing in response to these notices," the plaintiff is precluded from bringing its claims under Kentucky law.

Claims regarding the negligent provision of professional services, including construction and architectural services, are governed by KRS § 413.245.  *See, e.g., Old Mason's Home of Ky., Inc. v. Mitchell*, 892 S.W.2d 304, 306 (Ky. Ct. App. 1995) (applying KRS § 413.245 to claims regarding a defendant's "alleged failure . . . to provide quality work and to properly supervise work on the construction project").[1]  The statute provides, in relevant part:

> Notwithstanding any other prescribed limitation of actions which might otherwise appear applicable . . . a civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

KRS § 413.245.  The Supreme Court of Kentucky has explained that section 413.245 "actually provides two limitations periods: one year from the date of the 'occurrence,' and one year from

---

[1]     Affiliated FM asserts that § 413.245 only applies to claims "pursued against the professional by the person/entity to which it provided services." [Record No. 109, p. 18]  That claim fails, however, because it is flatly contradicted by both the text of the statute and Kentucky precedent. *See* KRS § 413.245 (applying to "a civil action . . . arising out of *any act or omission* in rendering, or failing to render, professional services for others") (emphasis added); *see also Seiller v. Waterman, LLC v. RLB Props., Ltd.*, 610 S.W.3d 188, 205 (Ky. 2020) ("Nothing in [KRS § 413.245] limits its application to only those claims brought by individuals or entities who engaged the professional to provide such services."); *Holt v. Thompson Hine, LLP*, No. 2017-CA-1245-MR, 2021 WL 3117129, at *2 (Ky. Ct. App. July 23, 2021) (same).

- 11 -

the date of the actual or constructive discovery of the cause of action." *Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 147 (Ky. 2007). Under the occurrence rule, a cause of action accrues at the time that "negligence and damages have both occurred." *Northwestern Nat'l Ins. Co. v. Osborne*, 610 F. Supp. 126, 128 (E.D. Ky. 1985); *see also id.* ("[T]he use of the word 'occurrence' in KRS 413.245 indicates a legislative policy that there should be some definable, readily ascertainable event which triggers the statute.").

A plaintiff whose claim is untimely under the occurrence rule may avail himself of the discovery rule, which permits filing within a year of the date that "the cause of action was discovered, or, in the exercise of reasonable diligence, should have been discovered." *Queensway*, 237 S.W.3d at 148. The discovery rule "often functions as a 'savings' clause or 'second bite at the apple'" for plaintiffs who claim that they were unaware of their cause of action at the time the alleged negligence occurred. *Id.* When a plaintiff asserts that its claims are timely under the occurrence and discovery rules, as in this case, the Court must determine when the limitations period commenced in both contexts.

### 1. Affiliated FM's Claims Are Untimely Under the Occurrence Rule.

As explained, the statute of limitations period commences under the occurrence rule when the cause of action accrues—in the context of a negligence claim, when there is both "a negligent act and resulting injury." *Id.* at 147. As Kentucky's Supreme Court has explained, "[t]he difficult question when applying the [occurrence] rule is usually not whether negligence has occurred but whether an 'irrevocable non-speculative injury' has arisen." *Id.* (quoting *Northwestern Nat'l Ins. Co.*, 610 F.Supp. at 128).

The plaintiff's claims against Walker are time-barred under the occurrence rule. As described in the Amended Complaint, Walker acted negligently when it failed to properly

- 12 -

inspect the repairs performed on the Parking Garage (Count 1), and when it misrepresented that RAM had substantially completed the repairs in the completion letter (Count 2). [Record No. 56, pp. 8-9] Walker conducted its final inspection of the Parking Garage in November 2018, and the defendant mailed the completion letter to LFUCG on January 30, 2019. The plaintiff's insured was damaged by Walker's negligence when it purchased the Parking Garage on January 30, 2019, and took ownership of a property that had not been repaired as expected. Accordingly, the undisputed facts demonstrate that under the occurrence rule, Counts 1 and 2 were time-barred on January 30, 2020.

Affiliated FM contends, however, that its claims are timely under the occurrence rule because its cause of action did not accrue until the Parking Garage collapsed on February 18, 2021. [Record No. 109, p. 20] It claims that even if Walker acted negligently before the collapse, LOF did not suffer "an irrevocable non-speculative injury until the actual collapse of the inverted tee beam." [*Id.*] This argument is unavailing because the plaintiff has failed to "focus on the correct injury and damages." *Queensway*, 237 S.W.3d at 148. Contrary to the plaintiff's claim, LOF was not initially injured when the Parking Garage collapsed. Instead, the harm to the plaintiff's insured occurred at the time of Walker's negligence: namely, the defendant's failure to properly supervise RAM's repairs and its misrepresentations in the completion letter. The increased harm resulting from the tee beam collapse pertains to the amount of damages suffered, rather than whether an injury occurred.

Additionally, Affiliated FM's damages were sufficiently fixed at the time LOF purchased the Parking Garage. Kentucky courts have recognized that a plaintiff need not "know with absolute certainty the amount of damages flowing from an incident" to find that a negligence claim has accrued. *Matherly Land Surveying, Inc. v. Gardiner Park Dev., LLC*,

- 13 -

230 S.W.3d 586, 591 (Ky. 2007); *see also Estill Cnty. Bd. of Educ.*, 84 F. App'x 516, 519 (6th Cir. 2003) ("[I]f plaintiff's interpretation is accepted, the limitations period for professional negligence actions would be effectively tolled until damages could be specified as an ascertainable sum certain.  This, of course, is not the law.").

In *Queensway*, the plaintiff sued a public accounting firm for misrepresenting the amount of a company's reserves in an audit report that the plaintiff relied upon when purchasing the company.  *Id.* at 143-47.  Queensway contended that its claims were timely under KRS § 413.245 because its damages became "fixed and non-speculative" at the time the Indiana Insurance Department ordered a $6 million dollar reserve adjustment.  *Id.* at 149.  The Supreme Court of Kentucky disagreed, explaining that the damages were sufficiently fixed at the time the plaintiff purchased the company.  *Id.* at 149-50.  As the court noted, "[a]ny damages that Queensway suffered became fixed and non-speculative when it purchased Paradigm. The company was either overpriced at that time or it was not."  *Id.* at 150.

Like in *Queensway*, LOF's claims accrued at the time it agreed to purchase the Parking Garage.  The record clearly reflects that LOF purchased the property with the expectation that RAM completed the repairs in Walker's assessment report.  As that was not the case, LOF was entitled to damages due to RAM's failure to perform—whether or not LOF was aware of that failure at the time of its purchase.  While the collapse of the tee beam may have increased the amount of damages to which the plaintiff is entitled, that subsequent increase does not render the pre-collapse amount of damages too speculative for purposes of accrual.  *Cf. Estill*, 84 F. App'x at 519 (rejecting plaintiff's argument that claim had not accrued under KRS § 413.245 because its damages were not sufficiently fixed, explaining "[t]hat the physical damage may

be increasing, . . . does not mean that the fact of injury was not 'fixed' upon the initial discovery of the damage").

### 2. Affiliated FM's Claims are Untimely Under the Discovery Rule.

The "second or 'discovery' limitation period begins to run when the cause of action is discovered or, in the exercise of reasonable diligence, should have been discovered." *Queensway*, 237 S.W.3d at 148.  As mentioned previously, Walker identifies four dates on which LOF was put on notice of its claims.  [Record No. 100-1, pp. 16-20]  Because the undisputed evidence demonstrates that the plaintiff was made aware of RAM's failure to complete the necessary repairs on March 4, 2019, the day of closing, the plaintiff's claims are time-barred under the discovery rule.

In *Lore, LLC v. Moonbow Investments, LLC*, a plaintiff's claims were time barred because the plaintiffs "reasonably should have discovered" their cause of action over a year before filing suit.  No. 2012-CA-001305, 2014 WL 507382, at *3 (Ky. Ct. App. Feb. 7, 2014).  In that case, the plaintiffs asserted professional negligence claims against construction and engineering companies for inspecting a building that had experienced stability issues.  *Id.*  The court found that the plaintiff's claims were untimely under KRS § 413.245 because the plaintiffs should have known "that a wrong had been committed" when they discovered cracks in the building's structure.  *Id.* at *9-10.  Although the parties anticipated some "cosmetic cracking," the degree of "'structural distress'" the plaintiffs observed should have "arous[ed] their suspicion that the engineering and architectural services provided were substandard."  *Id.* at *10.

By contrast, in *Rumpke of Ky., Inc. v. Terracon Consultants, Inc.* another judge in this district held that the plaintiff timely asserted claims against a geotechnical engineering

company for negligently repairing a perimeter berm because the plaintiff had no reason to suspect that the engineering company was negligent. No. 2: 19-cv-182, 2022 WL 5204572, at *6 (E.D. Ky. Oct. 5, 2022). The defendant claimed that the statute of limitations commenced under the discovery rule over a year before the plaintiff brought suit because the plaintiff observed "tension cracks . . . since at least 2005." *Id.* at *5. However, the court explained that the signs of damage witnessed by the plaintiff would not have put the company on notice of its claim because the defendant told the plaintiff that "additional settlement maintenance would be necessary" and that the plaintiff could expect "continued creek movement" after the defendant finished repairs. *Id.* at *6. Because the plaintiff could not have expected that damage to the building was the result of the defendant's negligence, its claims were timely under KRS § 413.245. *Id.*; *see also Old Mason's Home of Ky., Inc.*, 892 S.W.2d at 306 (noting that statute of limitations was triggered "at the time when [the plaintiff] discovered the problems about which it seeks redress").

Here, the record shows that LOF was put on notice that RAM had not completed its repairs on the Parking Garage over one year before the plaintiff filed this action. Marks informed LNR just before closing that LOF's engineer had advised him that "it does not appear the RAM Contract was completed." [Record No. 100-16] And on March 3, 2019, Webb and Marks discussed the possibility of receiving a credit on the purchase price to account for remaining repairs. [Record No. 100-15] Like in *Lore*, LOF was obviously aware that "a wrong had been committed" when Marks emailed LNR and Friedman immediately after the closing and requested a copy of RAM's contract to evaluate whether LOF could assert "claims against RAM for improper performance or failure to perform [its] contract." [Record No. 100-17] *See* 2014 WL 507382, at *9. Thus, the limitations period was triggered on March 4, 2019, when

- 16 -

the plaintiff's insured "should have known there were going to be damages." *Matherly*, 230 S.W.3d at 591.

LOF was further notified of its claim after the closing date, as Walker's motion correctly explains. Specifically, the plaintiff was clearly notified that the Parking Garage was inadequately repaired when Brady emailed Webb on March 8, 2019; when Brady told Webb on April 1, 2019, that necessary repairs had not been completed; and when LOF it received Yeiser's reports on October 29, 2019, and August 28, 2020. [Record Nos. 100-1, p. 16-21, 100-20,100-22] In addition to the parties' communications, the concrete falling from the ceiling of the Parking Garage should have put LOF on notice of its claims. [*See* Record No. 100-2, pp. 141-42.]

Unlike in *Rumpke*, there is no evidence that any of the defendants told LOF before it purchased the Parking Garage that the property would need further repairs, or that the plaintiff should expect to see signs of decay. Instead, as in *Lore*, the "structural distress" that LOF observed, as well as communications from the defendants indicating that RAM's repair work was incomplete, should have alerted LOF that something was amiss. Because LOF knew or reasonably should have known that it could assert a negligence claim at the time of closing, and because Affiliated FM failed to bring its claims within a year of LOF's discovery, the plaintiff's claims against Walker will be dismissed as time barred.

The plaintiff provides three reasons why its claims are timely: (1) LOF did not receive specific notice that the inverted tee beam in the Parking Garage was defective until the Parking Garage collapsed; (2) The Webb Companies was an independent contractor, so any information that Webb received regarding the Parking Garage cannot be imputed to LOF; and (3) equitable estoppel prevents the defendants from invoking the statute of limitations.

### a. Notice to LOF was Sufficiently Specific.

Affiliated FM first argues that its claims are timely because LOF did not "have knowledge of sufficient facts to sustain a cause of action" until February 18, 2021, when the Parking Garage collapsed. [Record No. 109, p. 21] It explains that, although LOF may have been aware of the "potential [for] additional garage work after the purchase," RAM never told LOF that the specific inverted tee beam that led to the Parking Garage's collapse had not been repaired. [*Id.* at pp. 21-22] Similarly, Yeiser's October 19, 2019 letter failed to provide sufficient notice because Yeiser did not "reference any issues with the inverted tee beam." [*Id.* at p. 22] While Yeiser's August 28, 2020 email mentions the inverted tee beam at issue, the plaintiff claims that the email did not make LOF aware of its cause of action because Yeiser "never connected the observed beam condition to the prior work of Walker and [RAM]." [*Id.*]

This argument fails because KRS § 413.245 does not require that a plaintiff know about the exact nature of its injury, or whose actions led to its injury, before the statute of limitations is triggered. LOF did not need to know that a specific inverted tee beam had not been repaired to have sufficient knowledge of its claims. "The discovery rule focuses not on when a plaintiff has actual knowledge of a legal cause of action, but whether a plaintiff acquired knowledge of existing facts sufficient to put the party on inquiry." *Blanton v. Cooper Indus., Inc.*, 99 F. Supp. 2d 797, 802 (E.D. Ky. 2000); *see also Hazel v. Gen. Motors Corp.*, 863 F.Supp. 435, 440 (W.D. Ky. 1994) (finding that knowledge of "[a]ny fact that should excite [a plaintiff's] suspicion is the same as actual knowledge of his entire claim . . . [and] the means of knowledge are the same thing in effect as knowledge itself").

LOF was sufficiently aware of its injury once it possessed information indicating that RAM had not completed the repairs contained in Walker's assessment report. At that time,

the plaintiff's insured "had a duty to exercise reasonable diligence to discover its cause of action within the time prescribed by the statute of limitations." *Victory Cmty. Bank v. Socol*, 524 S.W.3d 24, 29 (Ky. Ct. App. 2017).  Additionally, Walker correctly asserts that LOF "did not need to know who was responsible" for its injury for the limitations period to commence. [Record No. 100-1, p. 18]  Instead, courts have recognized that "[t]he statute of limitations begins to run as soon as the *injury* becomes known to the injured." *Matherly*, 230 S.W.3d at 591 (citing *Conway v. Huff*, 644 S.W.2d 333 (Ky. 1982)) (emphasis added).

Communications between the parties around the closing date revealed that RAM acted negligently in repairing the Parking Garage and that Walker misrepresented the nature of RAM's repairs in its completion letter.  That information was sufficient to "arouse [LOF's] suspicion that the [construction] services provided were substandard," and therefore triggered the limitations period under the discovery rule.  *Lore*, 2014 WL 507382, at *10.  Because LOF possessed sufficient information regarding the nature and source of its injury at closing, the plaintiff's argument that the statute of limitations did not commence until the date of the Parking Garage's collapse fails.

### b. The Webb Companies is an Agent of LOF.

Affiliated FM next claims that LOF was not aware of its injury until the Parking Garage's collapse because any information that the Webb Companies received was not conveyed to the plaintiff's insured.  [Record No. 109, pp. 17-18]  The plaintiff contends that because the Webb Companies was an independent contractor of LOF and not its agent, any knowledge that the company possessed regarding RAM and Walker's negligence cannot be imputed to LOF.  [*Id.*]  However, because LOF exercised sufficient control over the Webb

Companies to create an agency relationship, notice to the Webb Companies of RAM's potential negligence constitutes notice to LOF.

Under Kentucky law, agency is defined as a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *McAlister v. Whitford*, 365 S.W.2d 317, 319 (1962). Whether an agency relationship exists is a legal question that may be decided "after analyzing relevant facts," focusing on "whether the principal has a right to control the agent." *Couch v. Nat. Res. & Env't Prot. Cabinet*, 98 S.W.2d 158, 161 (Ky. 1999) (citation omitted). The party alleging agency bears the burden of proof and may establish the existence of an agency relationship through circumstantial evidence, "including by evidence of a party's continuous course of conduct." *Id.* Within a valid agency relationship it is generally understood that "a principal is charged with notice of facts that an agent knows or has reason to know." *BancInsure, Inc. v. U.K. Bancorporation Inc.*, 830 F. Supp. 2d 294, 301 (E.D. Ky. 2011).

In *CSX Transportation, Inc. v. First National Bank of Grayson*, the Kentucky Court of Appeals found that Custom Transportation, Inc. ("CTI") acted as an agent of the defendant, CSX Transportation, Inc. ("CSXT"), because the evidence demonstrated that CSXT exercised significant control over CTI. 14 S.W.3d 563, 565 (Ky. Ct. App. 1999). Although the parties' contract stated that CTI was an independent contractor, the court recognized that, "in determining whether one is an agent or servant or an independent contractor, substance prevails over form." *Id.* at 566 (citing *United Eng'rs and Constructors, Inc. v. Branham, Ky.*, 550 S.W.2d 540, 543 (1977)). Because the contract stated that CSXT "controlled CTI's ability to contract, its operational conduct, and the details of whether or not [an independent

contractor] would provide services through CTI," the defendant exercised sufficient control over CTI to establish the existence of an agency relationship.  *Id.* at 567.

In the same way, the Management Agreement and the parties' course of conduct establish that the Webb Companies acted as LOF's agent.  Affiliated FM is correct that the parties' agreement states that the Webb Companies is an independent contractor.  [*See* Record No. 110-3, p. 1 ("Owner hereby engages Manager as an independent contractor to manage the office building and related parking garage.").]  However, as Walker notes, other provisions indicate that LOF exercised control over the Webb Companies.  [Record No. 113, p. 3]  The agreement provides that the Webb Companies would act "in a fiduciary capacity with respect to the proper accounting for [LOF's] physical assets" and that the Webb Companies could not "enter into any contract for cleaning or servicing the [Parking Garage] . . . without the prior written consent of the Owner."  [*Id.* at pp. 2, 10]  Critically, the Management Agreement specifies that the Webb Companies was prohibited from spending over $5,000 on repairs "without prior written approval of LOF."  [*Id.* at p. 2]

Like in CSX Transportation, Inc., the parties' understanding of their agreement clearly demonstrates that the Webb Companies and LOF entered into an agency relationship.  Webb testified that, although LOF is a single purpose entity that lacks employees of its own, he owns 37% of LOF in a family trust.  [Record No. 100-2, pp. 17-18]  Webb further explained that while he is not a member of LOF, his company was hired to "help [LOF] buy the property and then redevelop it."  [*Id.* at p. 18]

The Webb Companies' extensive involvement in the purchase of the Parking Garage is evidenced by the fact that Dudley Webb is listed as the "Buyer's Contact Person" in LOF and WBCMT's Purchase Agreement.  [Record No. 78-1, p. 8]  Additionally, Dudley Webb

- 21 -

testified as LOF's corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure, suggesting that he, and the Webb Companies by extension, were closely connected to LOF.  [*Id.* at p. 14]  *See Alvey v. State Farm Fire & Cas. Co.*, No. 5: 17-CV-00023-TBR-LLK, 2018 WL 826379, at *3 (W.D. Ky. Feb. 9, 2018) ("The testimony of a Rule 30(b)(6) witness represents the knowledge of the corporation and presents the corporation's 'position' on the topic.") (citation omitted).  The terms of the Management Agreement and the parties' conduct shows that LOF exercised sufficient control over the Webb Companies' actions to establish an agency relationship.  Accordingly, any information received by the Webb Companies that would put LOF on notice of its cause of action amounted to notice to LOF itself.

Moreover, even if Webb was not an agent of LOF, the plaintiff's insured received sufficient notice of its claims through its attorney Tom Marks.  "Under agency law, notice to the attorney counts as notice to the client."  *Lampe v. Kash*, 735 F.3d 942, 944 (6th Cir. 2013); *see also Lisanby v. Illinois Cent. R. Co.*, 272 S.W. 753, 754 (Ky. Ct. App. 1925) ("It is . . . the general rule that knowledge of an attorney, at least where acquired in the course of his employment, is knowledge of his client.").  The parties do not dispute that Tom Marks was hired to handle the purchase of the Parking Garage for LOF.  [*See* Record Nos. 100-1, p. 7, 100-2, p. 71, 109, p. 11.]  And the record demonstrates that Marks was aware that RAM had significantly underperformed under the terms of its contract.  Marks received communication from Dudley Webb on March 3, 2019, in which Webb suggested that Friedman and WBCMT had failed to pay for the necessary repairs to the Parking Garage.  [Record No. 100-15] Additionally, Marks wrote to LNR and Friedman on the day of the closing, stating that "[f]rom the information we have it appears RAM has been paid in full, but only performed about 25%

of the work." [Record No. 100-17]  He was obviously aware of LOF's injury on that date, as he specifically stated that he needed a copy of RAM's contract because LOF "may have claims against RAM for improper performance or failure to perform their contract." [*Id.*]

In short, the record demonstrates that Marks knew, or "should have known there were going to be damages" when he assisted LOF with closing on its purchase of the Parking Garage. *Matherly*, 230 S.W.3d at 591.  And as LOF's attorney, knowledge that Marks acquired "in the course of his employment" can be imputed to LOF. *Lisanby*, 272 S.W. at 754.  Because LOF became aware through its attorney that it had been injured in March 2019, its second argument fails.

### c.  Equitable Estoppel Does Not Apply.

Finally, Affiliated FM claims that Walker should be prevented from invoking a statute of limitations defense under the doctrine of equitable estoppel.  [Record No. 109, pp. 23-25]  It asserts that Walker failed to disclose material facts regarding the repairs conducted on the Parking Garage and that it misrepresented RAM's work on the property in its completion letter.  Because LOF relied on the completion letter when it purchased the Parking Garage, the plaintiff contends that Walker's statute of limitations defense should not apply.

"The equitable estoppel doctrine is reserved for truly exceptional circumstances." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 67 (Ky. 2010).  Under this theory, a party may "prevent a party from relying on a statute of limitation by virtue of a false representation or fraudulent concealment." *Munday v. Mayfair Diagnostic Lab*, 831 S.W.2d 912, 914 (Ky. 1992).  A party claiming equitable estoppel must establish the following:

(1) [C]onduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party

- 23 -

subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts.  And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Sebastian-Voor Props., LLC v. Lexington-Fayette Urban Cnty. Gov't*, 265 S.W.3d 190, 194-95 (Ky. 2008).

Even if a genuine dispute of material fact exists regarding whether Walker's statements in the completion letter and omissions satisfy the first three elements of equitable estoppel, the plaintiff's argument fails because the record shows that LOF possessed the requisite "knowledge and of the means of knowledge of the truth as to the facts in question." *Id.* at 195. In *Hazel v. General Motors Corp.*, a plaintiff whose fuel tank in his vehicle ruptured claimed that the defendant's negligent design of the fuel tank led to his injuries.  863 F.Supp. 435, 440-41 (W.D. Ky. 1994).  The district court for the Western District of Kentucky declined to toll the statute of limitations under an equitable estoppel theory, finding that the plaintiff had sufficient knowledge of his cause of action at the time of his accident.  *Id.* at 439-40.

Although the defendant in *Hazel* failed to comply with its "statutory duty to notify the government and its purchasers of any defect in its product,"  the statute of limitations commenced on the day of the plaintiff's accident because, at that time, "the injury and the instrumentality causing the injury were obvious."  *Id.* at 438, 440.  Moreover, even if the plaintiff did not know about the particular design defect at issue, the limitations period would not be tolled because the "cause of action was clearly discoverable from analysis of the

instrumentality." *Id.* at 440.   Because the defendant's failure to warn the plaintiff of defects did not "prevent [the plaintiff] from learning enough to assess whether he should file a complaint," the court held that the defendant's concealment did not prevent applying the statute of limitations. *Id.*

And in *Newberry v. Service Experts Heating & Air Conditioning, LLC*, the Sixth Circuit held that equitable estoppel did not apply to claims that the defendants fraudulently misrepresented the repairs conducted on the plaintiffs' water system.   806 F. App'x 348, 352 (6th Cir. 2020).   There, the plaintiffs sued the defendants for negligently installing a water infiltration system in their home, but "voluntarily dismissed [the] initial lawsuit based on representations made by defendants' attorney that 'there was no present evidence of physical injury' to plaintiffs and that [the defendants] had tested the water from plaintiffs' home and found it to be safe." *Id.* at 354.

Despite the defendant's misrepresentations, the circuit court declined to estop the company from invoking the statute of limitations defense because "[the plaintiffs] have not alleged how SEHAC's misrepresentations about the quality of the water in their home prevented them from finding out about the water contamination or otherwise diligently pursuing their claims during the statutory period." *Id.* at 359.   Because the plaintiffs possessed the "means of acquiring [the] knowledge [of the water contamination]," they could not demonstrate that their reliance on the defendant's misrepresentations would have been reasonable. *Id.*; *see also Cantrell v. Ashland Oil, Inc.*, No. 2006-SC-000763-DG, 2010 WL 1006391, at *11 (Ky. Mar. 18, 2010) (declining to apply equitable estoppel against defendant who misrepresented that plaintiff's ground water was not contaminated because plaintiffs

failed to "demonstrate that Ashland Oil prevented them from discovering the damage to their ground water").

Like in *Hazel*, Affiliated FM has not demonstrated that Walker's failure to disclose the extent of RAM's repairs prevented LOF from discovering its cause of action. Even if Walker's omissions violated a statutory duty to disclose, as the plaintiff claims, LOF nonetheless possessed information that RAM had not completed the repairs listed in the project specifications when it closed on the property. The plaintiff's knowledge of the necessary facts to support its cause of action is evidenced by clear statements from Webb and Marks, both of whom recognized that RAM had not repaired the Parking Garage in accordance with its contractual obligations. [*See* Record Nos. 100-15, 100-16, 100-17.] Because any omissions from Walker did not prevent LOF from "learning enough to assess whether [it] should file a Complaint," the statute of limitations is not tolled due to the defendant's alleged concealment. *Hazel*, 863 F.Supp. at 440.

Walker's statements in the completion letter similarly do not warrant tolling the statute of limitations. The Court assumes *arguendo* that Walker misrepresented the nature of RAM's repairs when it stated that the "restoration work has been performed in substantial conformance with the contract documents." [Record No. 109-19] However, the plaintiff has not provided any evidence to explain how that statement prevented LOF from discovering that RAM had failed to complete the repairs or otherwise hindered LOF from inquiring about its claim. On March 4, 2019, Marks had already received documentation indicating that "RAM has been paid in full, but only performed about 25% of the work." [Record No. 100-17] And any doubts that the plaintiff had regarding RAM's negligence were confirmed by subsequent communications with RAM, and by Yeiser's two evaluations. Just as the plaintiffs in

*Newberry* were capable of acquiring information to support their claims against the water installation company, LOF was not prevented from obtaining the relevant evidence to support its claims.

Affiliated FM contends that a genuine issue of material fact exists regarding whether LOF justifiably relied on Walker's completion letter when it proceeded with the closing. [Record No. 109, pp. 24-25]  It points to testimony from Webb, who stated that the completion letter assured LOF that "the previous contracts had been adhered to, that the work had been inspected, that the work had been done properly, [and] that the contractor had been paid." [Record No. 100-2, p. 245]  But Webb's stated reliance on the completion letter is undermined by his own communications with Marks, in which he suspected that WBCMT was attempting to sell LOF the Parking Garage so that "they could somehow avoid paying [the construction costs]." [Record No. 100-15]  Indeed, Webb admits that LOF knew of its injury by March 4, 2019, at which time he stated that he and Marks were aware that "[there was] $625,000 of work that we were assured had been done that wasn't done." [Record No. 100-2, p. 301]  The plaintiff's bald assertion that LOF relied on the completion letter is insufficient to prove that any reliance was reasonable as a matter of law.

Regardless of whether LOF reasonably relied on Walker's statements in the completion letter, Affiliated FM has not provided any evidence suggesting that Walker's statements prevented LOF from discovering its cause of action.  To the contrary, the record establishes that LOF was able to discover evidence in support of its claims against Walker.  And even if LOF did not possess all the relevant information in March 2019, it possessed sufficient facts to "excite [its] suspicion," which "is the same as actual knowledge of [its] entire claim." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975).

- 27 -

Walker's concealment and statements in the completion letter did not "relieve [LOF] of [its] obligation to 'act diligently to investigate apparent possible causes of [its] injuries in order to pursue claims within the statute of limitations.'" *Newberry*, 806 F. App'x at 360 (citing *Fluke Corp.*, 306 S.W.3d at 67). Because the application of equitable estoppel is not appropriate, Affiliated FM's claims against Walker are time barred pursuant to KRS § 413.245. Walker's motion for summary judgment will be granted.

### III. Friedman's Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint that fails to "state a claim upon which relief can be granted." To survive a motion to dismiss, the plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this plausibility standard, a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Instead, the complaint must contain "either 'direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)).

Courts reviewing motions to dismiss "view the [subject] complaint in the light most favorable to the plaintiff and must accept as true all well-pleaded factual allegations contained within it." *Red Hed Oil, Inc.*, 292 F. Supp. 3d at 772 (citing *Ashcroft*, 556 U.S. at 678). The reviewing court may consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims therein, without

- 28 -

converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### A. LOF Fails to State a Claim for Fraudulent Concealment.

Affiliated FM asserts a fraudulent concealment claim against Defendant Friedman (Count 7). [Record No. 56, pp. 12-13]  The plaintiff alleges that Friedman "willful[ly], intentional[ly], and malicious[ly] fail[ed] to disclose the material fact that Walker and RAM had not completed all structural repair work on the Parking Garage," and that the defendant's concealment "induced LOF to proceed with closing on the purchase of the Parking Garage." [*Id.* at p. 12]  Friedman contends that the plaintiff's claim should be dismissed because the defendant had no duty to disclose the facts pertaining to RAM's repairs, that it did not fail to disclose any material facts pertaining to the Parking Garage, and that its alleged statements and omissions did not induce LOF to purchase the property.  [Record No. 101]

Under Kentucky law, a plaintiff asserting a claim of fraudulent concealment must allege that the defendant: (1) had a duty to disclose a material fact; (2) failed to disclose that fact; (3) that the failure to disclose induced the plaintiff to act; and (4) that the plaintiff suffered actual damages. *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998).  Friedman's motion to dismiss will be granted because the plaintiff has failed to allege that the defendant's actions or omissions induced LOF to purchase the Parking Garage.

This Court previously held that Affiliated FM had failed to state a claim for fraudulent concealment claim against LNR.  [*See* Record No. 95.]  Specifically, the Court found that LNR was an intended third party beneficiary of LOF's Purchase Agreement with WBCMT, and could therefore benefit from the agreement's terms shielding the defendant from liability for any statements or omissions occurring after the parties signed the contract.  [*Id.* at pp. 10-11,

- 29 -

17-18]  The Court further explained that Affiliated FM's fraudulent inducement claim would be dismissed against LNR because the plaintiff did not allege that any of LNR's statements or omissions in March 2019 induced LOF to sign the Purchase Agreement on January 30, 2019. [*Id.* at pp. 17-18]

Affiliated FM raises many of the same arguments that were previously rejected with respect to LNR's motion to dismiss.  But because the plaintiff has not pointed to any legal or factual difference justifying a different outcome in this matter, Friedman's motion to dismiss will be granted on similar grounds.

The plaintiff has failed to allege that any of Friedman's statements or omissions made prior to the signing of the Purchase Agreement actually induced LOF to enter into the contract. The parties signed the Purchase Agreement on January 30, 2019, and Friedman allegedly failed to disclose material information around March 4, 2019.  [Record Nos. 56, ¶ 28, 78-1]  The communications with Friedman that form the basis of Affiliated FM's claim, including Friedman's March 2019 email in which the defendant "[held] off on providing" certain documents to LOF, could not possibly have led LOF to sign the Purchase Agreement over a month earlier.  [Record No. 56-12]

Affiliated FM compares Friedman's failure to disclose to *Bryant v. Troutman*, in which a seller made false representations and omissions about a home to prospective buyers.  287 S.W.2d 918, 919 (Ky. 1956).  However, the Court already rejected the plaintiff's argument. [Record No. 95, pp. 14-15] In *Bryant*, the Supreme Court of Kentucky reasoned that any disclaimers in the parties' purchase agreement would not excuse the seller's fraudulent conduct because the seller's false statements "induced [the plaintiffs] to enter into the written contract." 287 S.W.2d at 919.  By contrast, LOF had already agreed to purchase the Parking Garage at

the time of Friedman's alleged omissions and misrepresentations.  Accordingly, the plaintiff's reliance on *Bryant* is misplaced.

Friedman's motion to dismiss is also appropriate because the defendant's statements regarding the Parking Garage made after the parties signed the Purchase Agreement are shielded from liability under the terms of the contract.  Friedman has presented evidence to establish that, as a member of WBCMT's "Seller Group," it was an intended beneficiary of the Purchase Agreement.  *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 579 (Ky. 2004) (recognizing that only "a third party who was intended by the parties to benefit from the contract" may "in his own right and name enforce a [contractual] promise").  The Purchase Agreement broadly defines the term "Seller Group" to include the "[s]eller and its member and such member's trustee . . . special servicer. . . and each of the foregoing parties' past, present, and future . . . members, agents, employees, representatives, participants, heirs, successors, assigns and attorneys."  [Record No. 78-1, p. 8]  As explained previously, that the Seller Group is referenced several times throughout the agreement demonstrates that WBCMT and LOF understood that members of that group would benefit from certain contractual terms.  [*See* Record No. 78-1, pp. 11, 12, 28, 32, Record No. 95, p. 10]  Although the Purchase Agreement contains a provision excluding third party beneficiaries, that single provision does not affect the Court's conclusion that WBCMT and LOF intended that other parties could benefit from their contract.

Friedman undoubtedly belonged to the "Seller Group" under the Purchase Agreement's expansive definition of the term.  The Fayette Circuit Court appointed Friedman as Receiver of the Parking Garage in 2017, directing the defendant to "preserve, operate, maintain, and

- 31 -

care for the Property."[2]   [Record No. 56-2, p. 12]   In that role, Friedman was authorized to, among other things, hire necessary personnel to manage the Parking Garage and "enter into contracts as the Receiver reasonably believes necessary for the operation of the Receivership Property not involving capital expenditures in excess of $10,000.00 . . . without Plaintiff's prior approval."   [*Id.* at pp. 12-13]   Friedman contracted with Walker to carry out its duties contained in the Fayette Circuit Court's Order.   [Record No. 56-6, pp. 1-2]   In light of the obligations imposed on Friedman in the Order appointing the defendant as Receiver of the property, the defendant spoke as WBCMT's "representative" when communicating with LOF about the Parking Garage.

The record confirms that LOF understood that Friedman acted as a representative of LOF.  Dudley Webb's email to Marks on March 3, 2019, refers to Friedman as "the managing agent of the seller."   [*See* Record No. 100-15.]   The Court declines to accept Friedman's argument that the defendant acted as an agent of LOF (an argument which Affiliated FM does not dispute), because the receivership was no longer in effect at the time the Purchase Agreement was signed.  Regardless, both parties clearly understood that Friedman represented

---

[2]       Friedman suggests that the Court should dismiss Affiliated FM's claim because the terms of the Order appointing Friedman as Receiver of the Parking Garage prohibited the plaintiff from filing this action.  [Record No. 115, p. 2 n.1]  The state court's Order provides that "[n]o person or entity shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting the suit or action."  [Record No. 56-2, p. 14]  Similarly, the Supreme Court in *Barton v. Barbour* recognized that as a general rule, "before suit is brought against a receiver[,] leave of the court by which he was appointed must be obtained."  104 U.S. 126, 128 (1881); *see also Dietrich v. Simon*, No. 16-11071, 2016 WL 6106742, at *2 (E.D. Mich. Sept. 14, 2016) ("Where a plaintiff neglects to obtain leave from the appointing court, a suit filed against the receiver in another court must be dismissed for lack of subject matter jurisdiction.").  However, because the Fayette Circuit court terminated Friedman's receivership on October 1, 2018, the leave of court requirement articulated in *Barton* does not apply to this proceeding.

WBCMT when it communicated with LOF, making the defendant a member of the "Seller Group" under the Purchase Agreement.

As a beneficiary of the contract, Friedman is shielded from liability under the terms of the Purchase Agreement. Friedman cannot be held liable for its omissions following the signing of the Purchase Agreement because the agreement provides that LOF purchased the Parking Garage "as is, where is, and with all faults," and that the plaintiff's insured could not rely on any representations "made by seller, or any of its employees or agents or *seller group*" regarding the property. [Record No. 78-1, pp. 14-15 (emphasis added)]

The plaintiff claims that the "as is" language in the Purchase Agreement should not preclude its fraudulent concealment claim because, under Kentucky law, a party "cannot contract against his own fraud." [*See* Record No. 114, p. 15 (citing *Bryant*, 287 S.W.2d at 920-21).] But the Court rejected that same argument in granting LNR's motion to dismiss, explaining that Kentucky courts have enforced "as is" provisions so long as the plaintiff was aware of the disclaimer and was not forced to sign the contract. [*See* Record No. 95, p. 14 (citing *Keeneland Ass'n, Inc. v. Eamer*, 830 F.Supp. 974, 986 (E.D. Ky. 1993); *Cohen v. N. Ridge Farms, Inc.*, 712 F. Supp. 1265, 1269 (E.D. Ky. 1989)).] Because the plaintiff has provided no evidence suggesting that LOF was unaware of the terms of the Purchase Agreement or was forced to sign the agreement, Friedman's "statements and omissions made after signing the Purchase Agreement are not actionable." [Record No. 95, pp. 18] The defendant's motion to dismiss will be granted.

## IV. Conclusion

Defendant Walker is entitled to judgment as a matter of law because Plaintiff Affiliated FM's negligence and misrepresentation claims are barred by the relevant statute of limitations.

More specifically, the plaintiff's claims are untimely under KRS § 413.245 because LOF reasonably should have known that it suffered damages in March 2019, when it became aware that RAM had not completed the repairs listed in Walker's assessment report. Moreover, equitable estoppel does not preclude the defendant from invoking the statute of limitations because, even if Walker misrepresented the exact nature of RAM's repairs, the plaintiff did not demonstrate that LOF was prevented from discovering the necessary evidence to support its claims.

Next, Defendant Friedman is entitled to dismissal of the claims asserted against it. Affiliated FM failed to state a claim for fraudulent concealment because it did not allege that any of Friedman's statements or omissions induced LOF to sign the Purchase Agreement. Moreover, Friedman cannot be held liable for its communications with LOF after January 30, 2019, because the Purchase Agreement expressly prevents LOF from relying on any of the defendant's representations regarding the Parking Garage.

Accordingly, it is hereby

**ORDERED** as follows:

1.      Defendant Walker's motion for summary judgment and Defendant Friedman's motion to dismiss [Record Nos. 100, 101] are **GRANTED**.

2.      Plaintiff Affiliated FM's claims asserted against Defendants Walker and Friedman are **DISMISSED**, with prejudice, and Walker and Friedman are **TERMINATED** as parties in this matter.

This Memorandum Opinion and Order does not affect the plaintiff's remaining claims asserted against Defendant RAM Construction Services of Michigan, Inc.

- 34 -

Dated: July 7, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky